## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| ANGELA CARTER, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No.: 16-cv-508-CG-B |
| v. | ) ) | **SECOND AMENDED** |
| L'ORÉAL USA, INC., and SOFT SHEEN-CARSON, LLC, | ) ) ) | **CLASS ACTION COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES** |
| Defendants. | ) ) | |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiff Angela Carter, on behalf of herself and all others similarly situated, and pursuant to Rule 15(a)(1)(B) of the FEDERAL RULES OF CIVIL PROCEDURE, brings this *Second Amended Class Action Complaint* against Defendants, L'Oréal USA, Inc. and Soft Sheen-Carson, LLC (*collectively*, "L'Oréal" *or* "Defendants"), and alleges on personal knowledge, investigation of her counsel, and on information and belief as follows:

## INTRODUCTION

1.      This is a class action brought by Plaintiff Angela Carter, on behalf of herself and all other similarly situated persons, against L'Oréal, USA, Inc. and Soft Sheen-Carson, LLC. Plaintiff seeks damages and equitable remedies for herself and the putative Class, which includes consumers who purchased Soft Sheen-Carson Optimum Salon Haircare® brand Amla Legend Rejuvenating Ritual Relaxer Kit (*hereinafter* "the Product").

2.      The Product is part of Defendants' Amla Legend product line, as indicated by the large, bold letters on the front and center of the Product's packaging. In their marketing and advertising materials, Defendants represent that their Amla Legend products, which include the

Product, are a "secret ritual for hair rejuvenation," and that "Amla oil's intense moisture will rejuvenate every strand, leaving you with thicker-looking, healthier hair," with "unique properties [that] prevent breakage, restore shine, manageability and smoothness."

3.      Defendants specifically market the Product to African American women as an "easy no-mix, no-lye relaxer kit that ensures an easier relaxing process for unified results and superior respect for hair fiber integrity".

4.      The Product is a kit made up of five (5) separate items to be applied in consecutive order in a single session; "A 5 Step Ritual":

      i.      Scalp Protector,

      ii.      Relaxer Base,

      iii.      Neutralizing Shampoo,

      iv.      Conditioner, and

      v.      Oil Moisturizer.

5.      The Product is sold through the Soft Sheen-Carson website and other online and "brick and mortar" retailers, including, but not limited to, Amazon, Wal-Mart, Target, CVS, Walgreens, and other cosmetic and beauty supply stores nationwide.

6.      As described herein, an inherent design and/or manufacturing defect in the Product causes significant hair loss and skin and scalp irritation, including burns and blistering (*collectively* "the Injuries"). At no time did Defendants provide Plaintiff with adequate disclosure or warning about the potential dangerous hazards of using the Product as directed by Defendants, of which Defendants have knowledge. Instead, Defendants make numerous assertions regarding the values of Product's purported safe and gentle qualities in their labeling, marketing and advertising materials, including that the Product is "NO-LYE", (*i.e., does not contain* Sodium

Hydroxide), is a "rejuvenating ritual" that "refills as it relaxes for amazingly lively-looking hair", "protects [the] scalp & skin", has "anti-breakage" properties, provides "unified results and superior respect for hair fiber integrity," and contains a "powerful anti-oxidant rich in vitamins and minerals."

7.      The Injuries caused by Amla Relaxer are not *de minimus*. Consumers damaged by the Product often have permanent hair loss. Plaintiff and the putative Class Members have suffered injury in fact and loss of money and/or property as a result of using Amla Relaxer.

8.      Unknown to Plaintiff or the putative Class Members at the time of purchase, and known to Defendants, the Product contained, and continues to contain, Sodium Hydroxide, also known as Caustic Soda or Lye (*hereinafter* "Lye"), and other caustic ingredients or combination of ingredients that causes Injuries upon proper application. Further, the instructions on how to "test" the Product and how to apply the Product are so woefully inadequate they are virtually useless.

9.      Lye is a very strong and caustic ingredient that can and does cause Injuries, including significant hair loss, skin and scalp irritation, burns, blistering, and may also compromise the immune system.

10.     The Product also contains other caustic and/or dangerous ingredients that can and do cause Injuries, including significant hair loss, skin and scalp irritation, burns, blistering, and may also compromise the immune system.

11.     As a result of the defective nature of the Product, it is unfit for its intended use and purpose.

12.     Defendants are aware that, when used as instructed, the Product causes Injuries due to a known material design or manufacturing defect. Despite Defendants' longstanding

knowledge, Defendants failed to take reasonable steps to disclose to and/or warn the Plaintiff and putative Class Members of the dangers associated with the use of the Product.

13.     As a direct and proximate result of the inherent design and/or manufacturing defects of the Product, Defendants knew or should have known that the Injuries caused by the Product constitute a breach of the Product warranties. Defendants knew or should have known that the Plaintiff and putative Class Members would suffer damages as a result of the Injuries caused by the Product. Defendants concealed material facts from the Plaintiff and putative Class Members by failing to disclose the true characteristics of and inherent design and/or manufacturing defects of the Product, which were known to Defendants and unknown to the Plaintiff and putative Class Members at the time of purchase. Defendants' conduct constitutes actionable misrepresentations and omissions as well as unfair, unlawful, fraudulent, and deceptive business practices.

14.     The Plaintiff and putative Class Members have been damaged by Defendants' concealment and non-disclosure of the defective nature of the Product because they were misled regarding the characteristics, ingredients, safety and value of the Product.

15.     Despite notice and knowledge of the problems caused by the Product Defendants have not recalled the Product or warned consumers about the true dangers associated with using the Product as directed and/or instructed by Defendants.

16.     If Defendants had disclosed to the Plaintiff and putative Class Members that the Product actually contained Lye they would not have purchased the Product.

17.      If Defendants had disclosed to the Plaintiff and putative Class Members that the Product contained other caustic and/or dangerous ingredients that could cause and have caused Injuries when used as directed by Defendants, they would not have purchased the Product.

18.     As a direct and proximate result of Defendants' misconduct, the Plaintiff and putative Class Members have suffered injury in fact, including economic damages.

## PARTIES

19.     Plaintiff, Angela Carter, is and was at all times relevant to this matter a resident citizen of the State of Alabama.

20.     Defendant, L'Oréal USA, Inc. is a Delaware corporation. At all times relevant to this matter, L'Oréal USA, Inc. was a citizen of the state of New York with a principal place of business in New York, New York. At all times relevant to this complaint, L'Oréal USA, Inc. has transacted business in this judicial district and throughout the United States.

21.     Defendant, Soft Sheen-Carson, LLC, is a New York domestic limited liability company. At all times relevant to this matter, Soft Sheen-Carson, LLC was a citizen of the state of New York with a principal place of business in New York, New York. At all times relevant to this complaint, Soft Sheen-Carson, LLC has transacted business in this judicial district and throughout the United States.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class members, the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member, Plaintiff Angela Carter, is a citizen of a state (*Alabama*) different from at least one Defendant.

23.     This Court has personal jurisdiction over Defendants as many of the acts and omissions giving rise to this action occurred in the State of Alabama, including purchases of the Product by the Plaintiff and other putative Class members. Defendants have sufficient minimum contacts with the State of Alabama and intentionally availed themselves, and continue to avail

themselves of the jurisdiction of this Court through their business ventures; specifically, the promotion, sale, marketing, and distribution of their products in this State.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this District as Defendants do business throughout this District, including promoting, selling, marketing and distributing the Product at issue, and Plaintiff purchased the Product in this District.

## FACTS COMMON TO ALL CLASS MEMBERS

**The SoftSheen-Carson Brand**

25.     In 1998, L'Oréal purchased Soft Sheen Products, Inc., which had grown from a small family business founded in 1964 in Chicago to be the nation's largest African-American-owned beauty products company. In 1999, L'Oréal acquired Carson Products, another leader in beauty products for African-American consumers, and in 2000 it merged the two companies to form SoftSheen-Carson. The then-chairman and CEO of L'Oréal declared the acquisitions a strategic step in enhancing the company's position in ethnic beauty markets both in the United States and globally.

26.     Today, using the SoftSheen-Carson brand, L'Oréal claims to continue a 110 year tradition of "stopping at nothing to give our customers the largest array of scientifically advanced beauty tools" to "consumers of African descent" with "innovative products that have been specially designed for their needs" and which are "safe, reliable, high quality products that are guaranteed to provide astonishing results." The company claims "SoftSheen-Carson has secured its place in the market as experts", that "all of the beauty products developed at the SoftSheen-Carson laboratories are specifically dedicated and adapted to perfectly meet our consumers' beauty needs" and that they "are committed to being the world leader in afro-specific hair care,

and continue to focus all of our energy on delivering state-of-the-art hair care technologies that our consumers can trust."[1]

27.     L'Oréal stresses the "Ingredient Science" embraced by its so-called SoftSheen Carson Laboratories: "By relying upon the depth of our scientific know-how, we are continually advancing our products in order to surpass the industry standards, making them the safest and most effective beauty products for our consumers."[1]

**The Amla Legend Relaxer Kit**

28.     In 2013, L'Oréal launched the "Amla Legend" line of hair products - a product range claimed to be "enriched with purified Amla extract that rejuvenates hair and undoes 2 years of damage in 2 weeks."[2]

29.     Defendants claimed, and continue to claim, that the Product is a nourishing, rejuvenating product which provides specific benefits, as set forth herein, most notably through their key ingredient, Amla Oil; a legendary, antioxidant rich oil derived from the Indian Amla superfruit.

30.     At all times relevant to this matter, Defendants created, developed, marketed, sold and distributed the Product to consumers throughout the United States.

31.     The Product is sold through the Soft Sheen-Carson website[3], and through other online and "brick and mortar" retailers, including Amazon, Wal-Mart, Target, CVS, Walgreens, and other mass cosmetics and beauty supply stores nationwide.

---

[1] http://www.softsheen-carson.com/about-us. (*last visited Dec. 26, 2016*).

[2] http://www.loreal.com/brand/consumer-products-division/african-beauty-brands (*last visited Dec. 26, 2016*).

[3] http://www.softsheen-carson.com/optimum-salon-haircare/amla-legend-no-mix-no-lye-relaxer ?upc=0752850088423 (*last visited Dec. 26, 2016*).

32.     On Defendants' website, Defendants promote the Product with the following representations:

> "An easy no-mix, **no-lye** cream relaxer **kit that ensures an easier relaxing process** for unified results and **superior respect for hair fiber integrity**. Our oil infusion technology is fast acting and long lasting."[4]

33.     On the website "Beauty Drama", an online cosmetics business which sells the Product, it is promoted with the following representations:

> "**Superior straightening, amazing body & shine. Rejuvenate** with the 1st no-mix relaxer with amla oil.
> An easy no-mix, **no-lye** cream relaxer **kit that ensures an easier relaxing process for unified results and superior respect for hair fiber integrity**. Our oil infusion technology is fast acting and long lasting."[5]

34.     On the website "Wal-Mart", which sells the product, it is promoted with the following representations:

> The Optimum Amla Legend No-Mix *__No-Lye__* Relaxer helps you to soften your hair for easier styling. It comes with everything you need for a complete application. This amla hair relaxer comes pre-mixed so you can start using it right out of the box. *__The no-lye formula prevents drying out and breakage so you end up with shinier, healthier-looking hair__*. It utilizes amla oil from India, which is a superfruit that's rich in vitamin E, antioxidants and minerals for natural effectiveness. This product is suitable for use with all types of hair.
>
> **Optimum Amla Legend No-Mix, No-Lye Relaxer:**
>
> * With amla oil from India
> * For all hair types

---

[4] https://web.archive.org/web/20150419014200/http://www.softsheen-carson.com/Optimum-Salon-Haircare/Amla-Legend-No-Mix-No-Lye-Relaxer?UPC=0752850088423 (*emphasis added*) (*last visited Dec. 26, 2016*).

[5] https://www.beautydrama.com/optimum-amla-legend-no-lye-no-mix-relaxer/ (*emphasis added*) (*last visited Dec. 26, 2016*).

- Contains: scalp protective pre-treatment, conditioning relaxer creme, neutralizing shampoo, conditioner, oil moisturizer, wooden spatula, instruction sheet, plastic gloves
- ***Features ingredients that are rich in anti-oxidants, vitamins and minerals***
- Optima hair relaxer has a ***no-lye formula*** to prevent drying out and breaking
- Comes pre-mixed to save you lots of time
- Each package comes with enough for a complete application
- Leaves your hair softer and easier to style

**"Superior Straightening, Amazing Body & Shine** An easy no-mix, **no-lye** cream **relaxer kit** that ensures an easier relaxing process for unified results and superior respect for hair fiber integrity. Our oil infusion technology is fast acting and long lasting."[6]

35.    On the website "Walgreens", which sells the product, it is promoted with the following representations:

**Rejuvenating Ritual**
No-Mix, **No-Lye**

- With Amla Oil from India

- For All Hair Types

- One Application

**"Refills to Reveal Visibly Fuller, Silkier Hair"**
Optimum Salon Haircare® unveils its 1st Rejuvenating Ritual for your hair, infused with a legendary Indian beauty secret:  Amla Oil.  Amla is derived from the Amla Superfruit, and is known as a powerful anti-oxidant, rich in vitamins and minerals, and renowned for its natural rejuvenating properties of intense nourishment and conditioning.  Experience the Legendary Power of Amla Oil!

**Amla Legend™ | A 5 Step Ritual**

**1.  Scalp Protector**
Protects Scalp & Skin

**2.  No-Mix, No-Lye Relaxer Base**
Ensures a No-Mistake Application

---

[6] https://www.walmart.com/ip/Optimum-Amla-Legend-No-Mix-No LyeRelaxer/24548828#about (*emphasis in original*) (*underlined italicized bolded emphases added*) (*last visited Dec. 26, 2016*).

**3. Neutralizing Shampoo**
Infuses Hydration & Conditioning

**4. Conditioner**
Intense Conditioning & Detangling

**5. Oil Moisturizer**
Anti-Dryness, Anti-Breakage, Anti-Dullness

**No-Mix Cream Relaxer**
Ensures an easier relaxing process for unified results and superior respect of hair fiber and integrity.

SoftSheen-Carson Laboratories® | African Hair and Skin Advanced Research[7]

36.     On the website "CVS", which sells the product, it is promoted with the following representations:

**SoftSheen-Carson Optimum Amla Legend Rejuvenating Ritual No-Mix No-Lye Relaxer**
Infuses hydration and conditioning, Intense detangling, No Mix, **No-Lye** Relaxer System For All Hair Types. Amla Legend Regular Relaxer ensures an easier relaxing process for untied results and superior respect of hair fiber & fiber integrity. Optimum Salon Haircare unveils its 1st Rejuvenating Ritual for your hair, infused with a legendary Indian beauty secret: Amla Oil. Amla is derived from the Amla Superfruit, and is known as a powerful anti-oxidant, rich in vitamins and minerals, and renowned for its natural rejuvenating properties of intense nourishment and conditioning.[8]

37.     The actual packaging for the Product also contains the following representations regarding its purported attributes:

- "Refills to reveal visibly fuller, silkier hair"
- "Refills as it relaxes for amazingly lively-looking hair"
- "Optimum Salon Haircare unveils its 1st Rejuvenating Ritual for your hair, infused with a legendary Indian beauty secret: AMLA Oil"
- "powerful anti-oxidant rich in vitamins and minerals"

---

[7] https://www.walgreens.com/store/c/optimum-salon-haircare-amla-legendrelaxer/ID=prod6185721-product (*emphasis in original*) (*last visited Dec. 26, 2016*).

[8] http://www.cvs.com/shop/beauty/hair-care/treatments/softsheen-carson-optimum-amla-legend-rejuvenating-ritual-no-mix-no-lye-relaxer-prodid-915172 (*emphasis in original*) (*last visited Dec. 26, 2016*).

- "natural rejuvenating properties of intense nourishment and conditioning"
- "protects scalp"
- "infuses hydration & conditioning"
- "anti-breakage" and
- "intense conditioning"
- "renowned for its natural rejuvenating properties"
- "Experience the LEGENDARY POWER of AMLA OIL!"
- "A 5 STEP RITUAL"
- "Read and follow enclosed instruction sheet before using."





38.     Lye relaxers can be abrasive and cause scalp irritation and chemical burns. By representing on the front of the Product packaging, in capitalized and bold letters, that the

Product has "NO-LYE," Defendants led Plaintiff, and continue to lead reasonable consumers and putative Class Members, to believe that the Product is non-abrasive, safe and gentle, and will not cause Injuries, including scalp burning or irritation, and/or hair loss. The "NO-LYE" claim in particular targets consumers who are seeking a gentler alternative to lye-based relaxers, which are known for their potential to cause irritation and to be harsh on hair and skin. However, the Product, specifically "step 3" – the "neutralizing shampoo", plainly lists Sodium Hydroxide (*i.e., "Lye"*) as an ingredient. Thus, Defendants' labeling, marketing, and comprehensive claims that the Product is a "NO-LYE" hair relaxer is not only deceptive and misleading, but is a flagrant misrepresentation of fact.



39. Sodium Hydroxide is a highly caustic[9] substance that is very corrosive. It is also known as and/or referred to as Caustic Soda, Soda Lye, "Red Devil Lye" and several other names. It is commonly used in many industries such as drain cleaners. According to the NATIONAL INSTITUTES FOR HEALTH's CENTER FOR BIOTECHNOLOGY INFORMATION (*a division of*

---

[9] "Caustics" are "[s]trong alkaline chemicals that destroy soft body tissues resulting in a deep, penetrating type of burn, in contrast to corrosives, that result in a more superficial type of damage via chemical means or inflammation." NATIONAL INSTITUTES FOR HEALTH's CENTER FOR BIOTECHNOLOGY INFORMATION (*a division of the National Library of Medicine*). https://pubchem.ncbi.nlm.nih.gov/compound/14798#section=Pharmacology-and-Biochemistry

*the National Library of Medicine*), Lye "may severely irritate skin", is [c]orrosive to … tissue", has "acute toxicity" to the skin, is "harmful" when "in contact with skin", "causes severe skin burns", "skin irritation", "redness", "pain", and "blisters" and even notes that "skin contact with [the] material may cause severe injury **or death**". Under the subsection "Safety and Hazards" it states, as to "Exposure Prevention", "AVOID ALL CONTACT!".[10] "When caustic soda comes into contact with the skin it does not usually cause immediate pain, but it does start to cause immediate damage. It fails to coagulate protein which would serve to prevent further penetration. Thus, upon contact with eyes, washing with water must be started within 10 seconds and continued for at least 15 minutes to prevent permanent injury. Following contact with skin, washing with water must be started immediately to prevent corrosive chemical burns." KIRK-OTHMER ENCYCLOPEDIA OF CHEMICAL TECHNOLOGY. (3rd Ed.), Volumes 1-26. New York, NY: John Wiley and Sons, 1978-1984, p.1:861.[11] The INTERNATIONAL CHEMICAL SAFETY CARD (ICSC)[12] data sheet for Lye states that expose to the skin may cause "redness" "pain" "serious skin burns"/"severe skin burns" and "blisters", than skin exposed to Sodium Hydroxide should be rinsed with "plenty of water or shower for at least 15 minutes", and because it is "corrosive to the … skin."[13] There is an abundance of published literature describing the severe nature of Lye induced skin injuries and Defendants' cannot deny their knowledge of Lye's dangerous

---

[10] https://pubchem.ncbi.nlm.nih.gov/compound/14798#section=Top (*bold emphasis added*).

[11] See also NIOSH; CRITERIA DOCUMENT: SODIUM HYDROXIDE p.62 (1975) DHEW Pub. NIOSH 76-105 ("*There is a latent period between contact of NaOH with the skin and the sensation of irritation.*").

[12] "The International Chemical Safety Cards (ICSC) are data sheets intended to provide essential safety and health information on chemicals in a clear and concise way." https://pubchem.ncbi.nlm.nih.gov/source/ILO-ICSC

[13] http://www.ilo.org/dyn/icsc/showcard.display?p_card_id=0360

characteristics – that is the exact reason they advertise, label and/or market the Product as "NO-LYE" to consumers, including the Plaintiff and putative Class Members.

40.     One of the reasons consumers seek out a no-lye relaxer is because they are looking for a product that is milder on the scalp and gentler on hair. By representing on the front of the Product packaging, in capitalized and bold letters, that Amla Relaxer has "NO-LYE," along with representations regarding rejuvenating, nourishing, conditioning qualities of the Product, Defendants led and continue to lead reasonable consumers, including the Plaintiff and putative Class Members, to believe that the Product not only did not and does not contain Lye, but was and is a gentler alternative to relaxers containing lye, when it does in fact contain Lye.

41.     Despite the fact the Product is marketed as a "NO-LYE" hair relaxer, not only is it made with Lye but it is composed of numerous other ingredients that have the potential to be every bit as caustic, dangerous, and damaging as Lye.

42.     Hydroxide relaxers are often made with sodium hydroxide, potassium hydroxide, lithium hydroxide, or guanidine hydroxide. Lye based relaxers are frequently used by professionals, but are they known for their potential to cause skin irritation.[14] Thus, hydroxide relaxers made without Sodium Hydroxide (*i.e., "Lye"*) are frequently marketed as "NO-LYE" to appeal to consumers. Defendants' marketed and continue to market the Product as "NO-LYE" to appeal to consumers, including the Plaintiff and putative Class Members despite the fact Lye is listed as an ingredient.

---

[14] Hydroxide relaxers generally have a high pH, and thus a strong potential to cause chemical burns. A pH level measures the acidity or alkalinity of a solution on a scale of 0 to 14. Alkalis are bases with a pH of more than 7. The stronger the alkali the more corrosive or caustic the hydroxide. Although the pH level depends on the concentration of the hydroxide, Sodium Hydroxide typically has a pH of 14. Lithium Hydroxide, an ingredient found in "step 2" – the "Relaxer Base", typically has a pH of 10.

43.    Defendants' admit they are experts in the field of hair care products:

**OUR LEGACY**
**For over 110 years Softsheen-Carson has provided beauty to all consumers of African descent with innovative, tailor-made, superior products and services.**
**...**
Our broad and deep portfolio of brands, which are both rich with heritage and at the height of innovation, make us unique. By relying upon ***the depth of our scientific know-how***, we are continually advancing our products in order to ***surpass the industry standards, making them the safest*** and most effective beauty products for our consumers.

**INGREDIENT SCIENCE**
***With the help of scientists, biologists, and physicists*** at our ***laboratories***, Softsheen-Carson has ***secured its place in the market as experts, conducting advanced research in order to bring our consumers safe, reliable, high quality products that are guaranteed to provide astonishing results***.

Our unique and dedicated ***team of scientists and biologists*** has allowed us to develop advanced and extensive knowledge, ***making us the experts on hair and skin physiology for consumers*** of African descent on a worldwide scale.  For this reason, all of the beauty products developed at the Softsheen-Carson laboratories are specifically dedicated and adapted to perfectly meet our consumers' beauty needs.

We are committed to being ***the world leader in afro-specific hair care***, and continue to focus all of our energy on delivering state-of-the-art hair care technologies that our consumers can trust.[15]

44.    Defendants, as manufacturers of the Product, and thus experts in the field of hair care products, had a duty to warn its consumers, including the Plaintiff and putative Class Members, of the true risks and dangers associated with using the Product because the Plaintiff and putative Class Members are <u>not</u> experts in the field of hair care products, and relied upon Defendants to truthfully represent the qualities of the Product. However, as set forth herein, Defendants failed to do so.

---

[15] http://www.softsheen-carson.com/about-us (*emphasis added*) (*last visited Dec. 26, 2016*).

45. As Defendants are well-aware, the Product not only contains Lye, but also encompasses a mix of other ingredients that are as dangerous and caustic as lye. For example, the ingredient Lithium Hydroxide, found in "step 2" – the "relaxer base", can cause damaging effects including severe irritation, burns, and blisters. According to the NATIONAL INSTITUTES FOR HEALTH's CENTER FOR BIOTECHNOLOGY INFORMATION (*a division of the National Library of Medicine*), Lithium Hydroxide "may cause severe irritation to skin, eyes, and mucous membranes" and "may be toxic by … skin absorption", causing "redness" "pain" "serious skin burns" and "blisters" and "skin contact with may cause severe injury **or death**". Just like warning for handling Lye, under the subsection "Safety and Hazards" it states, as to "Exposure Prevention", "AVOID ALL CONTACT!".[16] The INTERNATIONAL CHEMICAL SAFETY CARD (ICSC) data sheet for Lithium Hydroxide is virtually identical to that for Lye, stating that expose to the skin may cause "redness" "pain" "serious skin burns"/"severe skin burns" and "blisters", than skin exposed to Lithium Hydroxide should be rinsed with "plenty of water or shower for at least 15 minutes", and because it is "corrosive to the … skin."[17] Since the Product is made to be applied to the user's hair, there is no avoiding potentially harmful skin contact. Defendants knew or should have known of these findings.

46. Defendants' "NO-LYE" representation is clearly deceptive and misleading by the fact ordinary consumers would not readily recognize the scientific term Sodium Hydroxide as being Lye; a highly caustic component of the Product's. Indeed, the ingredient Lithium Hydroxide, found in "step 2" – the "relaxer base", can cause damaging effects not unlike Sodium

---

[16] https://pubchem.ncbi.nlm.nih.gov/compound/3939 (*bold emphasis added*).

[17] http://www.ilo.org/dyn/icsc/showcard.display?p_card_id=0913

Hydroxide including severe skin irritation, burns, and blisters. Defendants knew or should have known of these facts.

47. The Product is not a safe, effective, gentler or "easier relaxing process", is not a "rejuvenating ritual" and is not free of Lye as described on the Product's packaging and other marketing materials. Rather, it is composed of Lye and other ingredients that may cause injury:

   a. "step-2" – the "Relaxer Cream" contains Hexylene Glycol, which can cause contact dermatitis and irritate the skin, eyes, and respiratory tract[18]. According to the NATIONAL INSTITUTES FOR HEALTH's CENTER FOR BIOTECHNOLOGY INFORMATION (*a division of the National Library of Medicine*), Hexylene Glycol "causes skin irritation" and/or "skin corrosion", "dermatitis" and "skin sensitization".[19]

   b. "step-2" – the "Relaxer Cream" contains Cocamidopropyl Betaine, a synthetic surfactant associated with skin irritation and allergic contact dermatitis[20]. According to the NATIONAL INSTITUTES FOR HEALTH's CENTER FOR BIOTECHNOLOGY INFORMATION (*a division of the National Library of Medicine*), Cocamidopropyl Betaine causes "skin irritation" and/or "skin corrosion".[21]

   c. "step-3" – the "Relaxer Cream" contains PPG (Polyethylene Glycol a/k/a Ethylene Glycol a/k/a/ Polyethylene Glycol 400) which may cause contact dermatitis.[22] According to the NATIONAL INSTITUTES FOR HEALTH's CENTER FOR BIOTECHNOLOGY INFORMATION (*a division of the National Library of Medicine*), Polyethylene Glycol can be absorbed into the body through the skin, causes "irritation" to the skin.[23] It may also cause "skin sensitization"[24], "lowering of consciousness", and "may cause effects on

---

[18] http://www.contactdermatitisinstitute.com/hexylene-glycol.php;
see also https://www.cdc.gov/niosh/pel88/107-41.html;

[19] https://pubchem.ncbi.nlm.nih.gov/compound/7870#section=Top

[20] http://www.contactdermatitisinstitute.com/cocamidopropyl-betaine.php; see also Mowad, C., *Cocamidopropyl betaine allergy"*. AM. J. CONTACT DERMAT. 12(4): 223–224 (Dec. 2001).

[21] https://pubchem.ncbi.nlm.nih.gov/compound/20280#section=Top

[22] http://www.contactdermatitisinstitute.com/polyethylene-glycol-400.php

[23] https://pubchem.ncbi.nlm.nih.gov/compound/174#section=Regulatory-Information

[24] https://www.osha.gov/dts/chemicalsampling/data/CH_240404.html

the kidneys and central nervous system, resulting in renal failure and brain injury."[25]

d.    "step-3" – the "Relaxer Cream" contains Polybutylene Glycol. According to the NATIONAL INSTITUTES FOR HEALTH's CENTER FOR BIOTECHNOLOGY INFORMATION (*a division of the National Library of Medicine*), Polybutylene Glycol "causes skin irritation" and "skin corrosion".

e.    "step-3" – the "Neutralizing Shampoo" contains Potassium Sorbate. According to the NATIONAL INSTITUTES FOR HEALTH's CENTER FOR BIOTECHNOLOGY INFORMATION (*a division of the National Library of Medicine*), Potassium Sorbate causes "skin irritation" and/or "skin corrosion" and may cause "contact dermatitis".[26]

f.    "step-3" – the "Neutralizing Shampoo" contains Disodium EDTA (a/k/a EDTA Disodium Salt). According to the NATIONAL INSTITUTES FOR HEALTH's CENTER FOR BIOTECHNOLOGY INFORMATION (*a division of the National Library of Medicine*), Disodium EDTA "causes skin irritation" and/or "skin corrosion", is acutely toxic to the skin.[27]

g.    "step-3" – the "Neutralizing Shampoo" contains Sodium Laureth Sulfate. According to the NATIONAL INSTITUTES FOR HEALTH's CENTER FOR BIOTECHNOLOGY INFORMATION (*a division of the National Library of Medicine*), Sodium Laureth Sulfate (a/k/a Cydoryl NA) "causes skin irritation" and/or "skin corrosion".[28]

h.    "step-3" – the "Neutralizing Shampoo" contains Polysorbate 20 (a/k/a Polyoxyethylene Sorbitan Monooleate). According to the NATIONAL INSTITUTES FOR HEALTH's CENTER FOR BIOTECHNOLOGY INFORMATION (*a division of the National Library of Medicine*), Polysorbate 20 "may cause skin irritation" and "in case of skin contact" with the chemical, one should "[w]ash off with soap and plenty of water".[29] Notably, "step-2" – the

---

[25] https://www.cdc.gov/niosh/ipcsneng/neng0270.html; <u>see</u> <u>also</u> Pohanish, R.P. (editor): Ethylene Glycol. In, *Sittig's Handbook of Toxic and Hazardous Chemicals and Carcinogens, Fourth Ed.*, Vol. 1. Norwich, NY: Noyes Publications, William Andrew Publishing, 2002, pp. 1088-1090.

[26] https://pubchem.ncbi.nlm.nih.gov/compound/23676745#section=Top

[27] https://pubchem.ncbi.nlm.nih.gov/compound/13020083#section=Top

[28] https://pubchem.ncbi.nlm.nih.gov/compound/23665884#section=Top

[29] https://pubchem.ncbi.nlm.nih.gov/compound/86289060#section=Top

"Relaxer Cream" contains Polysorbate 60. It is reasonable to assume it causes skin irritation just like Polysorbate 20, however Plaintiff does not know if that would result in a likelihood of a higher chance for skin irritation and/or a higher chance of the extent of the skin irritation.[30]

i.  "step 4" – the "Neutralizing Shampoo" contains Benzyl Salicylate a "well-recognised consumer allergen" in Europe, required to be labeled on all cosmetics[14], and is a potential "Endocrine Disruptor"[31]. According to the NATIONAL INSTITUTES FOR HEALTH's CENTER FOR BIOTECHNOLOGY INFORMATION (*a division of the National Library of Medicine*), Benzyl Salicylate "may cause an allergic skin reaction" and/or "sensitization".[32]

j.  "Step-5" – the "Oil Moisturizer" contains Methylisothiazolinone, a powerful synthetic biocide[33] and corrosive chemical. In 1998, the U.S. ENVIRONMENTAL PROTECTION AGENCY deemed Methylisothiazolinone a skin sensitizer that causes skin irritation found to be "moderately to highly toxic in … dermal irritation … studies", "highly acutely toxic when applied dermally" to laboratory animals, and "may cause skin sensitization reactions in some people". See U.S. ENVIRONMENTAL PROTECTION AGENCY, Reregistration Eligibility Decision (RED) Facts - Methylisothiazolinone.[34] It is associated with contact dermatitis[35] and in 2013 the substance was declared the *2013 Contact Allergen of the Year* by the American Contact Dermatitis Society. See DERMATITIS, 2013 Jan-Feb; 24(1):2-6.[36] Methylisothiazolinone is of the most predominant contact

---

[30] Polysorbates help certain chemicals dissolve in a solvent in which they otherwise would not dissolve (*e.g., to disperse oil in water*).

[31] Charles, A.K., Darbre, P.D., *Oestrogenic activity of benzyl salicylate, benzyl benzoate and butylphenylmethylpropional (Lilial) in MCF7 human breast cancer cells in vitro.* J. APPL. TOXICOL. 29(5):422-434 (July 2009) (Article ABSTRACT: "*Further research is now needed to investigate whether oestrogenic responses are detectable using in vivo models and the extent to which these compounds might be absorbed through human skin and might enter human breast tissues.*").

[32] https://pubchem.ncbi.nlm.nih.gov/compound/8363#section=Top

[33] "A substance (as DDT) that is destructive to many different organisms." MERRIAM-WEBSTER DICTIONARY: https://www.merriam-webster.com/dictionary/biocide

[34] https://www3.epa.gov/pesticides/chem_search/reg_actions/reregistration/fs_G-58_1-Oct-98.pdf.

[35] http://www.contactdermatitisinstitute.com/database.php

[36] https://www.ncbi.nlm.nih.gov/pubmed/23340392

allergens found in cosmetic products. Lundov, M.D., Krongaard, T., Menné, T.L., & Johansen, J.D., *Methylisothiazolinone contact allergy: a review*. BRITISH JOURNAL OF DERMATOLOGY, 165(6)**:** 1178-1182 (July 2011); <u>see</u> <u>also</u> Lundov M.**D.**, Opstrup M.**S.**, Johansen J.**D.**, *Methylisothiazolinone contact allergy--growing epidemic*. CONTACT DERMATITIS, 69(5): 271-275 (Nov. 2013). According to the NATIONAL INSTITUTES FOR HEALTH'S CENTER FOR BIOTECHNOLOGY INFORMATION (*a division of the National Library of Medicine*), Methylisothiazolinone has acute dermal toxicity characteristics (*i.e., "toxic in contact with the skin"*) and may cause allergic skin reactions, including sensitization.[37]

k.      "Step-5" – the "Oil Moisturizer" contains Limonene (a/k/a d-Limonene), which may cause contact dermatitis.[38] According to the NATIONAL INSTITUTES FOR HEALTH'S CENTER FOR BIOTECHNOLOGY INFORMATION (*a division of the National Library of Medicine*), Limonene "causes skin irritation", "skin corrosion", skin "sensitization", "redness" and "pain". It is also registered for pesticide use in the United States.[39]

l.      "step-4" – the "Conditioner" contains Propylene Glycol (a/k/a 1,2-propanediol), which may cause contact dermatitis.[40] According to the NATIONAL INSTITUTES FOR HEALTH'S CENTER FOR BIOTECHNOLOGY INFORMATION (*a division of the National Library of Medicine*), Proplylene Glycol "[m]ay cause primary skin irritation in some people" but "is not a sensitizer".[41]

---

[37] https://pubchem.ncbi.nlm.nih.gov/compound/39800#section=Top
A maximum of 100 ppm of Methylisothiazolinone is permitted in cosmetic products. In one study, eighteen percent (18%) of Methylisothiazolinone-allergic patients reacted to a concentration <u>20 times lower</u> in a repeated open application test. <u>See</u> Lundov, M.D., Zachariae, C., Johansen J.D., *Methylisothiazolinone contact allergy and dose-response relationships*. CONTACT DERMATITIS, 64(6):330-6 (June 2011). Defendants knew or should have known of these findings.

[38] http://www.contactdermatitisinstitute.com/d-limonene.php.

[39] https://pubchem.ncbi.nlm.nih.gov/compound/440917#section=Top

[40] http://www.contactdermatitisinstitute.com/database.php

[41] https://pubchem.ncbi.nlm.nih.gov/compound/1030#section=Top

m. "step-1" – the "Scalp Protector" contains Diethylhexyl Maleate, a "well-recognised consumer allergen" in Europe and required to be labeled on all cosmetics[42].

Defendants knew or should have known of these findings.

48. Unlike the Defendants, who are experts in hair care products, the dangerous and defective nature of the Product is not readily apparent to a layperson by examination of its ingredients list; a reasonable consumer (*i.e., layperson*) such as the Plaintiff and putative Class Members would not recognize the dangers of the ingredients (*i.e., chemicals*) because they would not know what the various ingredients are, what the ingredients do or how they work, and/or whether they are safe for the use the Product as promoted, marketed and labeled by Defendants. Moreover, an ordinary consumer, including the Plaintiff and putative Class Members, could certainly not know or be expected to know how all of these ingredients/chemicals react to each other nor the synergistic result of exposure to them all in using the Product in one session, as directed by Defendants.

49. Defendants' website for the Product is particularly misleading as it <u>only</u> lists the ingredients found in "step 2" – the "Relaxer Base" and not the ingredients of *any* of the other "4 steps", particularly that Lye is an ingredient in "step 3" – the "Neutralizing Shampoo".

PRODUCT DETAILS     INGREDIENTS

AQUA / WATER / EAU, PARAFFINUM LIQUIDUM / MINERAL OIL / HUILE MINERALE, PETROLATUM, CETEARYL ALCOHOL, POLYSORBATE 60, BUTYLENE GLYCOL, HEXYLENE GLYCOL, LITHIUM HYDROXIDE, PEG-75 LANOLIN, OLETH-10, COCAMIDOPROPYL BETAINE, PARFUM / FRAGRANCE, COCOS NUCIFERA OIL/COCONUT OIL, PHYLLANTHUS EMBLICA FRUIT EXTRACT

http://www.softsheen-carson.com/optimum-salon-haircare/amla-legend-no-mix-no-lye-

---

[42] EUROPEAN COMMISSION. *Opinion on fragrance allergens in cosmetic products.* Scientific Committee on Consumer Safety, 2011.

relaxer?upc=0752850088423&filterkey=optimum-salon-haircare-relaxer (*last visited Dec. 26, 2016*).

50. Notably, the "legendary" Amla Oil ingredient - Phyllanthus Emblica (Gooseberry) Fruit Extract – appears last on the ingredients list, indicating that of all ingredients found in the Product, the ingredient that is found in the smallest measurable amount is Amla Oil.[43]

51. Defendants knew, know, and/or should have known of the caustic ingredients and dangerous nature of the Product as well as the false, deceptive and/or misleading representations it has made and continues to make about the Product.

52. Although, consistent with 21 U.S.C. § 361(a), Defendants instruct users to conduct a preliminary test to help determine whether a user will have an adverse reaction to the Product, the preliminary test Defendants recommend and the directions and instructions for its administration are inadequate.

53. Defendants, as developers, manufacturers and distributors of the Product, and as experts in the field of hair care products, had a duty to adequately instruct its consumers, including the Plaintiff and putative Class Members, on how to safely and properly use the Product because the Plaintiff and putative Class Members are not experts in the field of hair care products. As experts in the field of hair care products, and as the manufacturers, creators, distributors and/or sellers of the Product, Defendants' possessed superior knowledge and intelligence regarding the safety and value of the Product as compared to ordinary consumers who purchased the product, including the Plaintiff and putative Class Members.

---

[43] "The ingredients must be declared in descending order of predominance." 21 C.F.R. § 701.3(a).

54.     Defendants knew or should have known that their recommended at-home "strand test" is an inadequate and flawed method to determine if a user will have an adverse reaction and/or suffer Injuries from using the Product.

55.     Defendants' direct that consumers "PLEASE FOLLOW INSTRUCTION SHEET", which is provided in the Products box. This "Instruction Sheet" (i.e., "Application Instructions") is defective, confusing, ambiguous, misleading and/or deceptive and, therefore, promotes the potential for a consumer to suffer Injuries as descried *infra*.

56.     Defendants provide inadequate "strand test" instructions with the Product in which Defendants use ambiguous words and/or phrases such as a "small section of hair" and "a small amount of Scalp Protective" without providing any direction as to what equates to "small" or what instruments, tools, or methods should be used to measure the actual amount of hair or chemical to ensure that the proper amount of hair and/or product are being used.

57.     Defendants failure to provide any instruction or information as to what is meant by a "small section of hair" and "a small amount of Scalp Protective" leaves the consumer, including the Plaintiff and putative Class Members, to guess, speculate and/or assume as to the proper amount and/or what "small" is intended to mean.

58.     The ordinary user is further instructed to apply "the No-Mix Relaxer Cream" but given no direction or instruction as to what amount to use; the package insert is void of any reference to the expected or required quantity to be applied. Consequently, the Defendants' instructions regarding the at-home "strand test" testing procedure are fundamentally flawed and wholly inadequate.

59.     The lack of any specific instructions in the package insert make it impossible to determine what a "small" amount is for at-home "strand test" testing purposes.

60.    Since the entire Product application process is dependent on the accuracy of the "strand test" (*"**Follow the processing time indicated by the strand test**"* [*emphasis in original*] and *"Do not leave relaxer in contact with the hair for more than the time determined by the strand test"*), which is inadequate on its face, the entirety of the Product "Application Instructions", created and provided by Defendants, experts in the field of hair products, is inadequate and useless and, therefore, likely to cause Injuries.

61.    Thus, Defendants failed to adequately warn or disclose the probability that an ordinary user, such as the Plaintiff and putative Class Members, will have an adverse reaction to Product by virtue of the Defendants' at-home "strand test" testing instructions and, correspondingly, "Application Instructions".

62.    The Internet is replete with consumer complaints that describe the Product causing severe adverse reactions such as significant hair loss, burns, and blisters. There are hundreds of consumer complaints on the Internet about the Product causing burning and hair loss. Consumer complaints from Amazon.com dating back to 2013, shortly after the Product was released to the public, illustrate the disturbing trend of Injuries:

> ●"**I have never experienced burns like the burns from this product.** by the time I walked up the stairs to the bathroom it was unbearable. I pray my skin returns to normal and they should be sued." – Amazon Review, April 26, 2013

> ●"Do NOT buy if you love your hair."
> "A little background: I'm 30 years old, with medium to fine high-density hair. I've been relaxing my own hair since I was 19, and prior to that, my mother did my relaxers. Always relaxed my hair once every 3-4 months because I could always manage my new growth. I've never had any issues with breakage/falling out, anything at all after relaxing my hair."
> "Until now."
> "Note above that I said I had some high-density hair. So even though my hair is medium to fine, I had a heck of a lot of hair (think Chaka Khan, seriously). **After using the ENTIRE bottle of neutralizer, when I went to detangle after conditioning, my hair started coming out in chunks. Just, chunks of hair coming out. It's a week later, and my hair is still coming out. And I'm not talking about breakage, I'm**

**talking about the entire strand is coming out from the root (and I have armpit length hair).** So now, I'm taking every step I can to preserve the length and get my density back since I now have extremely thinned out hair..." –Amazon Review, April 26, 2013.

●"PLEASE DO NOT BUY THIS RELAXER!!! THIS IS THE WORST RELAXER I HAVE EVER USED!!! **IT CAUSED SEVERE DAMAGE TO MY HAIR AND I AM NOW DEALING WITH BALDING AND SHEDDING FOR THE FIRST TIME IN MY LIFE!!!** DO NOT USE OPTIMUM AMLA RELAXER IF YOU WANT TO KEEP YOUR HAIR!!! I ALMOST NEVER POST REVIEWS BUT AFTER USING THIS PRODUCT I FEEL COMPELLED TO WARN OTHER WOMEN ABOUT THIS PRODUCT!!! I AM GOING TO TELL EVERYONE I KNOW TO STAY AWAY FROM THIS CRAP IN A JAR!!! TO THE MAKERS OF THIS PRODUCT: YOU SHOULD BE ASHAMED BUT THANKS FOR HELPING ME MAKE UP MY MIND TO GO NATURAL!!!! I WILL NEVER USE ANY SOFT SHEEN PRODUCTS EVER AGAIN!!! IF I COULD SUE I WOULD!!!" – Amazon Review, May 6, 2013.

●"Don't use it! My 26 year old daughter is upstairs crying her eyes out because her **hair is gone.** And I (her mother) relaxed it for her. We **followed directions she has been relaxing for years.** We did not leave it on too long. She **now has no hair on the sides or back of her head. Even with the scalp protector and vaseline around her edges No Hair and her scalp is burned badly I did notice a lot of hair loss during rinsing** but never imagined this. Stay away from this product I didn't know how to do no stars so I did one but for us it's a big fat 0 stars." –Amazon Review, September 27, 2013.

●"This product will make your hair fall out. **I only had it on for about 10 min and my hair was breaking off in chunks. Whatever is left on my head is soo damaged I feel like it all needs to be cut off.** A class action lawsuit should be filed." – Amazon Review, December 22, 2014.

●"Do not use!!!! Usually when I use relaxers it's to loosen the curl I have. **This relaxer is like pure lye!!!!!** I have a short hair cut, took only 6 minutes to apply and **immediately my scalp was burning so bad I was in tears!** My bathroom to my kitchen sink is literally 20ft, I had to put the water to the coldest setting to get relief. Thank God I'm a hair stylist and know what to do to repair my hair!!!! This is the worst product Optimum has ever put our. The relaxers before were good but this one is trash. The Amla styling products are good but the relaxer.....TERRIBLE." – Amazon Review, June 15, 2015.

●"First I must say that I had shoulder length hair before using this relaxer! I bought this relaxer from WAmlart due to the "no mix" in hopes of a quicker process. **This relaxer took my haircut in clumps. It is now 3 weeks later and my hair is still coming out! I have bald spots in the back of my head and I will now have to cut my hair off and start all over. If you love your hair please DO NOT buy this product.**" – Amazon Review, October 11, 2015.

●"DO NOT USE THIS PRODUCT!!!! I BOUGHT THIS RELAXER FROM A SALLY BEAUTY SUPPLY IN TEXAS. **MY HAIR IS EXTREMEY DAMAGED. I HAVE A BALD SPOT IN THE CROWN OF MY HEAD, MY HAIR HAS COME OUT AROUND MY EDGES AND NAPE AREA AND THROUGHOUT MY HAIR I HAVE SHORT DAMAGED SPOTS. I WEAR MY HAIR SHORT AND NOW I HAVE ALMOST NO HAIR. I NOW HAVE TO WEAR WIG. I AM DEVASTATED!!!!**" – Amazon Review, March 19, 2016.

●"Run Away!!
DO NOT BUY THIS PRODUCT!!!!! I used this relaxer last week. I read the directions and did the strand test. Everything seemed fine so I proceeded to do my whole head. I have a short hair style so the process does not take a long time. It took about 10 minutes to cover my new growth and I began to try to smooth the growth but my scalp began to burn so I just washed it out. It took the whole bottle of neutralizer to wash it out and I watched in horror and my hair was coming out with each wash!! I was left with a big hole on the side of my head where my hair just came out and a big hunk of hair as a souvenir. I used to use Optimum relaxer (pink box) but I will never use their products again! – Amazon Review, September 20, 2016.[44]

    63.    Despite notice and knowledge of the Injuries caused by the Product via the numerous consumer complaints Defendants have directly received and which are publicly available on the Internet, Defendants have failed and/or refused to provide an adequate warning against and/or remedy for the systemic Injuries caused by the Product. Defendants have not recalled the Product[45] or warned consumers about the dangers associated with using the Product as directed by Defendants. Instead, on occasions when consumers have reported Injuries, Defendants have covertly offered to pay consumers' medical expenses caused by using the Product as directed by Defendants, along with conditioning treatments and wigs to cover the

---

[44] https://www.amazon.com/Softsheen-Carson-Optimum-Legend-Relaxer/dp/B00B1KM1XM #customerReviews (*last visited Dec. 26, 2016*).

[45] The FDA is not authorized to order recalls of cosmetics.
http://www.fda.gov/Cosmetics/ComplianceEnforcement/RecallsAlerts/ucm173559.htm
Recalls of cosmetics are "voluntary actions" manufacturers and distributors of products "carry out [as part of] their responsibility to protect the public health and well-being from products that present a risk of injury or gross deception or are otherwise defective". 21 CFR § 7.40(a).

resulting hair loss. In short, rather than address the systemic problems inherent to the Product, Defendants pay off - or attempt to pay off - individual consumers and cover up the problems, while continuing to market, distribute and sell the Product without warning consumers about the severe and known consequences of using the Product as directed by Defendants.

64. "It is the manufacturer's and/or distributor's responsibility to ensure that products are labeled properly."[46] Because the U.S. FOOD AND DRUG ADMINISTRATION has limited enforcement ability to regulate cosmetic companies under the FOOD, DRUG & COSMETIC ACT, 21 U.S.C. § 301 *et seq.*, consumers, including the Plaintiff and putative Class Members, rely exclusively on cosmetic companies like Defendants who have the autonomy to decide whether to manufacture and distribute safe products. Here, the Plaintiff and putative Class Members relied to their detriment on Defendants, who opted to manufacture and distribute a hair product that is defective in design and/or manufactured and sold by means of false, deceptive and/or misleading advertising, marketing and/or labeling

65. As a result of the false, deceptive and misleading statements on the Product packaging, advertising and marketing materials, including material omissions regarding the true characteristics of the product and/or the dangerous and unsafe nature of the Product, the Plaintiff and putative Class Members purchased the Product with no reason to know or suspect the true dangers associated with using the Product as directed by Defendants. Plaintiff and the putative Class Members relied on Defendants as experts in the area of hair care products to be honest and forthcoming about the true risks and dangers of suffering Injuries when using the Product. Even after sustaining Injuries, reasonable consumers may not understand the causative connection between the Injuries and Defendants' false, deceptive and misleading statements regarding the

---

[46] http://www.fda.gov/Cosmetics/Labeling/Regulations/default.htm#information_required (*last visited Dec. 26, 2016*).

absence of Lye in the Product, the purported safe and gentle nature of the Product, and the active concealment of the Product defects as set forth herein.

66. As a direct and proximate result of Defendants' false, deceptive and/or misleading statements, and material omissions, Plaintiff and putative Class Members have suffered injury in fact and a loss of money or property through the out-of-pocket costs expended to purchase the Product, as well as the costs of mitigating the Injuries sustained as a result of using the Product as directed by Defendants.

67. By marketing, selling and distributing the Product to consumers throughout the United States, Defendants made actionable statements that the Product was free of defects in design and/or manufacture, and that it was safe and fit for its ordinary intended use and purpose. Further, Defendants concealed what they knew or should have known about the safety risks resulting from the material defects in design and/or manufacture of the Product.

68. Defendants, as manufacturers of the Product, are held to the level of knowledge of an expert in the field of that type of hair care product, and had a duty not to conceal, omit or misrepresent in any manner whatsoever the safety risks resulting from the material defects in design and/or manufacture of the Product and how to use/apply the Product. "Companies and individuals who manufacture or market cosmetics have a legal responsibility to ensure the safety of their products."[47]  Given Defendants' admitted superior knowledge and expertise, which are not shared by ordinary consumers including the Plaintiff and putative Class members, they had a compelling obligation to make a full and fair disclosure of the safety and value of the Product without concealing any facts within their knowledge.

---

[47] http://www.fda.gov/Cosmetics/GuidanceRegulation/LawsRegulations/ucm074162.htm (*last visited Dec. 26, 2016*).

69.     Defendants made the above-described actionable statements, and engaged in the above-described omissions and concealments with knowledge that the representations were false, deceptive and/or misleading, and with the intent that consumers rely upon such omissions and concealments. Alternatively, Defendants were reckless in not knowing that these representations and material omissions were false and/or misleading at the time they were made.

70.     Thus, the Defendants' representations regarding the value and/or benefits of the Product, discussed herein are false, deceptive and/or misleading. In reality, the Product can and does cause Injuries, including burning, skin irritation and hair loss, when used in accordance with the instructions provided with the Product as directed by Defendants.

## PLAINTIFF'S FACTUAL ALLEGATIONS

71.     After reviewing advertisements and Product packaging for the Product regarding its purported safe, innovative, and gentle qualities, Plaintiff purchased the Product from softsheen-carson.com in or around May of 2014.

72.     As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Product because she reasonably believed that the Product's "no-mix, no-lye" attributes would be gentle, safe, and not impair the strength of her hair. Plaintiff would not have purchased the Product if she knew of it contained Lye and other ingredients that had a propensity to cause Injuries, including scalp burning, irritation, and hair loss.

73.     At no time did Defendants provide Plaintiff with adequate disclosure or warning about the potential dangerous hazards of using the Product as directed by Defendants, of which Defendants had knowledge.

74.     Plaintiff followed the instructions on the Product packaging, as directed by Defendants, including performing a strand test. The strand test was, in Plaintiff's opinion,

successful in that she did not suffer any negative side effects. However, upon application of the Product according to the instructions Plaintiff experienced scalp burning and irritation, leaving her with scabs, sores, and bald patches on her head.

75.     Plaintiff did not make the causal connection between application of the Product and her Injuries due to Defendants' false, deceptive and misleading statements regarding the absence of Lye in the Product, the purported safe and gentle nature of the Product, and the Defendants' active concealment of the Product's defects. Plaintiff reasonably assumed she may have received a "bad batch" of the Product, improperly performed the "strand test" and/or overall Product application given the confusing nature of the Product instructions and the fact that use of the process requires five-steps.

76.     Thereafter, Plaintiff waited several months and purchased the Product from softsheen-carson.com again in or around October of 2014 in order to give the Product another try. Just as before, Plaintiff followed the instructions on the Product packaging, as directed by Defendants, including performing a strand test. The strand test was, in Plaintiff's opinion, successful in that she did not suffer any negative side effects. However, upon application of the Product according to the instructions Plaintiff again experienced scalp burning and irritation, leaving her with scabs, sores, and bald patches on her head.

77.     Plaintiff again did not make the causal connection between application of the Product and her Injuries due to Defendants' false, deceptive and misleading statements regarding the absence of lye in the Product, the purported safe and gentle nature of the Product, and the active concealment of the Product defects. Plaintiff again reasonably assumed she may have received a "bad batch" of the Product, improperly performed the "strand test" and/or overall

Product application given the confusing nature of the Product instructions and the fact that use of the process requires five-steps.

78.     Plaintiff, who has a high school diploma and is not an expert in hair products or the chemicals contained in the Product, did not discover, realize, conclude and/or make the causal connection that her injuries arose from the Product, its ingredients, defective nature, inadequate warnings and/or inadequate and confusing Product instructions until approximately August/September of 2016 while reading on the Internet.

79.     Plaintiff would not have purchased the Product if she knew of and understood it actually contained Lye despite the front of the Product claiming in did not contain Lye, and that the Product had the propensity to cause Injuries, including scalp burning, irritation and hair loss.

80.     Although Plaintiff's scalp burns have healed, her hair remains thin and brittle and she continues to have hair loss and scalp issues to the present day.

## CLASS ACTION ALLEGATIONS

81.     Plaintiff brings this action on her own behalf, and on behalf of the following Class pursuant to FED. R. CIV. P. 23(a), 23(b)(2), and/or 23(b)(3). Specifically, the Class is defined as:

> All persons in the United States or its territories who, within the relevant and applicable statute of limitations period, purchased the Soft Sheen-Carson Optimum Salon Haircare® brand Amla Legend Rejuvenating Ritual Relaxer Kit.

82.     Excluded from the Class are (a) any person who purchased the Product for resale and not for personal or household use, (b) any person who signed a release of any Defendant in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of any Defendant or any entity in which a Defendant has a controlling interest, (d) any legal counsel or employee of legal counsel for any Defendant, and (e) the presiding Judge in the Lawsuit, as well as the Judge's staff and their

immediate family members. Plaintiff reserves the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

83.     Plaintiff also brings this action on behalf of the following subclass pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and/or 23(b)(3).

> All residents of the State of Alabama who, within the relevant and applicable statute of limitations period, purchased the Soft Sheen-Carson Optimum Salon Haircare® brand Amla Legend Rejuvenating Ritual Relaxer Kit.

84.     Excluded from the "Alabama Subclass" are (a) any person who purchased the Product for resale and not for personal or household use, (b) any person who signed a release of any Defendant in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of any Defendant or any entity in which a Defendant has a controlling interest, (d) any legal counsel or employee of legal counsel for any Defendant, and (e) the presiding Judge in the Lawsuit, as well as the Judge's staff and their immediate family members.

85.     **Numerosity.** Class Members are so numerous and geographically dispersed that joinder of all Class Members is impracticable. While the exact number of Class Members remains unknown at this time, upon information and belief, there are thousands, if not tens of thousands of putative Class Members. Class Members may be notified of the pendency of this action by mail and/or electronic mail, which can be supplemented if deemed necessary or appropriate by the Court with published notice.

86.     **Predominance of Common Questions of Law and Fact.** Common questions of law and fact exist as to all Members of the Class and predominate over any questions affecting

only individual Class Members. These common legal and factual questions include, but are not limited to, the following:

a.  Whether Defendants failed to comply with their warranties;

b.  Whether Defendants' conduct constitutes a breach of applicable warranties;

c.  Whether the Product causes burning, scalp irritation and/or hair loss upon using the Product as directed by Defendants;

d.  Whether the Product contains design defects;

e.  Whether the Product is defective in its manufacture;

f.  Whether and when Defendants knew or should have known that the Product causes burning, scalp irritation and/or hair loss upon using the Product as directed by Defendants;

g.  Whether Defendants were unjustly enriched by selling the Product in light of their conduct as described herein;

h.  Whether Defendants' acts, omissions or misrepresentations of material facts constitute fraud;

i.  Whether Defendants' acts, omissions or misrepresentations of material facts violate the ALABAMA DECEPTIVE TRADE PRACTICES ACT;

j.  Whether Defendants' acts, omissions or misrepresentations of material facts make them liable to the Plaintiff and the putative Class for negligence and/or strict products liability;

k.  Whether the Plaintiff and putative Class Members have suffered an ascertainable loss of monies or property or other value as a result of Defendants' acts, omissions or misrepresentations of material facts;

l.  Whether the Plaintiff and putative Class Members are entitled to monetary damages and, if so, the nature of such relief; and

m.  Whether the Plaintiff and putative Class Members are entitled to equitable, declaratory or injunctive relief and, if so, the nature of such relief.

87.  Pursuant to Rule 23(b)(2), Defendants have acted or refused to act on grounds generally applicable to the putative Class, thereby making final injunctive or corresponding

declaratory relief appropriate with respect to the putative Class as a whole. In particular, Defendants have designed, manufactured, marketed, sold and/or distributed a defective, misbranded and/or falsely labeled Product, which Defendants know or should have known causes Injuries to ordinary consumers upon using the Product, as directed by Defendants, and provided no disclosure or warning to consumers regarding these severe consequences.

88. **Typicality.** Plaintiff's claims are typical of the claims of the Members of the putative Class and respective Subclasses, as each putative Class and Subclass Member was subject to the same common, inherent defect in the Product and/or misrepresentations regarding the safety and/or actual value of the Product. Plaintiff shares the aforementioned facts and legal claims or questions with putative Class and Subclass Members, and the Plaintiff and all putative Class and Subclass Members have been similarly affected by Defendants' common course of conduct alleged herein. Plaintiff and all putative Class and Subclass Members sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of Defendants' breach of warranties and other wrongful conduct as alleged herein.

89. **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the putative Class and respective Subclasses. Plaintiff has retained counsel with substantial experience in handling complex class action litigation, including complex questions that arise in this type of consumer protection litigation. Further, Plaintiff and her counsel are committed to the vigorous prosecution of this action.

90. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the present controversy for at least the following reasons:

> a. The damages suffered by each individual putative Class Member do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct;

b. Even if individual Class Members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

c. The claims presented in this case predominate over any questions of law or fact affecting individual Class Members;

d. Individual joinder of all putative Class Members is impracticable;

e. Absent a Class, the Plaintiff and putative Class Members will continue to suffer harm as a result of Defendants' unlawful conduct; and

f. This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which the Plaintiff and putative Class Members can seek redress for the harm caused by Defendants.

91. Alternatively, the Class may be certified for the following reasons:

a. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants;

b. Adjudications of individual Class Members' claims against Defendants would, as a practical matter, be dispositive of the interests of other putative Class Members who are not parties to the adjudication and may substantially impair or impede the ability of other putative Class Members to protect their interests; and

c. Defendants have acted or refused to act on grounds generally applicable to the putative Class, thereby making appropriate final and injunctive relief with respect to the putative Class as a whole.

**CAUSES OF ACTION**

**COUNT I**
**UNJUST ENRICHMENT**
**(On behalf of the Nationwide Class and State Subclass)**

92. Plaintiff, individually and for the Class, incorporates by reference all preceding paragraphs as though fully set forth herein.

93. Plaintiff asserts this cause of action on behalf of the Nationwide Class.

94.     A party is unjustly enriched when it retains a benefit to the detriment of another party aga4nst the fundamental principles of justice, equity, and good conscience.

95.     Defendants have been unjustly enriched by engaging in the wrongful acts and omissions set forth herein; transactions with Plaintiff and the Class Members which were intended to result in, and did result in, sale of Defendants' Product.

96.     Defendants have been unjustly enriched after making false, deceptive and/or misleading representations in advertisements, promotional material and/or on the labels of the Product because Defendants knew, or should have known, that the representations made were unsubstantiated, false, deceptive and/or misleading.

97.     Defendants have reaped millions of dollars in revenue as a direct and proximate result of its scheme to mislead and deceive the Plaintiff and Class members regarding its unsubstantiated, false, deceptive and/or misleading representations set forth herein. That Defendant has amassed such earnings by virtue of deceptive and misleading behavior violates fundamental principles of justice, equity, and good conscience.

98.     The Plaintiff and putative Class Members have been damaged as a direct and proximate result of Defendants' unjust enrichment because they would not have purchased the Product on the same terms or for the same price had they known of the dangers and hazards associated with use of the Product, and/or that it contained Lye when it was clearly branding as not containing Lye.

99.     Defendants continue to be unjustly enriched by the deceptive and misleading labeling and advertising of the Product.

100.    When required, the Plaintiff and Class Members are in privity with Defendants because Defendants' sale of the Product was either direct or through authorized sellers. Purchase

through authorized sellers is sufficient to create such privity because such authorized sellers are Defendants' agents for the purpose of the sale of the Product.

101.     As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, the Plaintiff and putative Class Members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendants for their inequitable and unlawful conduct.

<u>COUNT II</u>
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. § 2301,** *et seq.***)**
**(On behalf of the Nationwide Class)**

102.     Plaintiff, individually and for the Class, incorporates by reference all preceding paragraphs as though fully set forth herein.

103.     Plaintiff asserts this cause of action on behalf of the Nationwide Class.

104.     Defendants sold the Product as part of their regular course of business.

105.     Plaintiff and putative Class Members purchased the Product either directly from Defendants or through authorized retailers such as Amazon, Wal-Mart, Walgreens and/or beauty supply and cosmetics stores, among others.

106.     The MAGNUSON–MOSS WARRANTY ACT, 15 U.S.C. §§ 2301, *et seq.*, provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

107.     The Product is a "consumer product" as that term is defined by 15 U.S.C. § 2301(1), as it constitutes tangible personal property which is distributed in commerce and which is normally used for personal, family or household purposes.

108.     Plaintiff and putative Class Members are "consumers" and "buyers" as defined by 15 U.S.C. § 2301(3), since they are buyers of the Product for purposes other than resale.

109.     Defendants are entities engaged in the business of making and selling cosmetics, either directly or indirectly, to consumers such as the Plaintiff and the putative Class Members. As such, Defendants are "suppliers" as defined in 15 U.S.C. § 2301(4).

110.     Defendants made promises and representations in an express warranty provided to all consumers, which became the basis of the bargain between the Plaintiff, the putative Class Members, and the Defendants. Defendants expressly warranted that the Product was fit for its intended purpose by making the express warranties that the Product did not contain Lye, is an "anti-breakage" and "intense conditioning" "rejuvenating ritual" that is "rich in vitamins in minerals" and which "[r]efills to reveal visibly fuller, silkier hair", "protects scalp & skin" and "infuses hydration & conditioning" and other representations as set forth herein.

110.     Defendants' aforementioned written affirmations of fact, promises and/or descriptions, as alleged, are each a "written warranty." The affirmations of fact, promises and/or descriptions constitute a "written warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

111.     Defendants breached the applicable warranty because the Product suffers from latent and/or inherent defects that cause substantial Injuries, rendering it unfit for its intended use and purpose. These defects substantially impair the use, value and safety of the Product.

112.     The latent and/or inherent defects at issue herein existed when the Product left Defendants' possession or control and were sold to the Plaintiff and putative Class Members. The defects were not discoverable by the Plaintiff and putative Class Members at the time of their purchase of the Product.

113.     All conditions precedent to seeking liability under this claim for breach of express warranty have been performed by or on behalf of the Plaintiff and putative Class Members in

terms of paying for the goods at issue. Defendants knew or were placed on reasonable notice of the defects in the Product and their breach of the warranty but have failed to cure the defects for the Plaintiff and putative Class Members despite having several years to do so.

114.    Defendants breached their express warranties since the Product did not contain the properties it was represented to possess, and because it did contain properties it was represented not to possess.

115.    Defendants' breaches of warranties have caused the Plaintiff and putative Class Members to suffer Injuries, pay for a defective Product, and enter into transactions they would not have entered into for the consideration paid. As a direct and proximate result of Defendants' breaches of warranties, the Plaintiff and putative Class Members have suffered damages and continue to suffer damages, including economic damages in terms of the cost of the Product and the cost of efforts to mitigate the damages caused by using the Product.

116.    As a direct and proximate result of Defendants' breaches of these warranties, the Plaintiff and putative Class Members are entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and all such other relief deemed appropriate, for an amount to compensate them for not receiving the benefit of their bargain.

117.    The Plaintiff and the putative Class therefore seek and are entitled to recover damages and other legal and equitable relief, injunctive relief and costs and expenses (*including attorneys' fees based upon actual time expended*), as provided by 15 U.S.C. § 2310(d).

## COUNT III
## BREACH OF EXPRESS WARRANTY
### (On behalf of the Nationwide Class)

118.    Plaintiff, individually and for the Class, incorporates by reference all preceding paragraphs as though fully set forth herein.

119. Plaintiff asserts this cause of action on behalf of herself and the Nationwide Class.

120. Defendants manufactured, marketed, distributed and sold the Product as part of their regular course of business.

121. The Plaintiff and the putative Class Members purchased the Product either directly from the Defendants or through authorized retailers such as Amazon, Wal-Mart, Walgreens, and/or beauty supply and cosmetics stores, among others.

122. Defendants, as the designers, manufacturers, marketers, distributors, or sellers expressly warranted that the Product was fit for its intended purpose by making the express warranties that the Product did not contain Lye, is an "anti-breakage" and "intense conditioning" "rejuvenating ritual" and which delivers "unified results," "respects hair fiber integrity," "reveal[s] visibly fuller, silkier hair", "protects scalp & skin" "infuses hydration & conditioning," and contains a "powerful anti-oxidant rich in vitamins and minerals", and other representations as set forth herein.

123. Defendants made the foregoing express representations and warranties nationwide to all United States consumers, which became the basis of the bargain between the Plaintiff, the putative Class Members and Defendants, thereby creating express warranties that the Product would conform to Defendants' affirmations of fact, representations, promises, and descriptions.

124. Defendants breached the foregoing express warranties by placing the Product into the stream of commerce and selling it to consumers, when the Product does not contain the properties it is represented to possess and does contain certain properties it represents it does not contain. Rather, the Product suffers from latent and/or inherent design and/or manufacturing defects that cause substantial Injuries, rendering the Product unfit for its intended use and purpose. These defects substantially impair the use, value and safety of the Product.

125. The latent and/or inherent design and/or manufacturing defects at issue herein existed when the Product left Defendants' possession or control and were sold to the Plaintiff and other putative Class Members nationwide. The defects were not discoverable by the Plaintiff and putative Nationwide Class members at the time of their purchase of the Product.

126. As the manufacturers, suppliers, and/or sellers of the Product, Defendants had actual knowledge of the breach, and given the nature of the breach, and the false representations and/or omissions of fact regarding the Product, Defendants necessarily had knowledge that the representations made were false, deceptive and/or misleading.

127. Defendants were further provided reasonable notice of the aforementioned Product defects and their breach of the above-described warranties via direct communications and complaints from consumers who reported Injuries sustained as a result of using the Product as directed by Defendants. Defendants were provided further notice of the Product defects and the breach of warranties via the hundreds of consumer complaints, including complaints from putative Class Members, posted on various websites, including, but not limited to, Amazon.com.

128. The Plaintiff and the putative Class Members were injured as a direct and proximate result of Defendants' breaches of warranties because they would not have purchased the Product if the true facts had been known. Specifically, economic damages in connection with the purchase of the Product and suffering Injuries from using the Product, as directed by Defendants.

129. As a direct and proximate result of Defendants' breaches of these warranties, the Plaintiff and the putative Class Members Nationwide are entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and all such other relief deemed appropriate, for an amount to compensate them for not receiving the benefit of their bargain.

**COUNT IV**
**BREACH OF IMPLIED WARRANTY**
**(On behalf of the Nationwide Class)**

130.    Plaintiff, individually and for the Class, incorporates by reference all preceding paragraphs as though fully set forth herein.

131.    Plaintiff asserts this cause of action on behalf of herself and the Nationwide Class.

132.    Section 2-314 of the UNIFORM COMMERCIAL CODE provides that, unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. To be "merchantable," goods must, inter alia, "pass without objection in the trade under the contract description," "run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved," be "adequately contained, packaged, and labeled as the agreement may require," and "conform to the promise or affirmations of fact made on the container or label."

133.    Defendants formulated, manufactured, tested, marketed, promoted, distributed, and sold the Product as safe for use by the public at large, including the Plaintiff and putative Class Members who purchased the Product.

134.    Defendants knew the use for which the Product was intended and impliedly warranted the product to be of merchantable quality, safe and fit for the use intended.

135.    The Plaintiff and putative Class Members reasonably relied on the skill and judgment of the Defendants, and as such their implied warranty, in using the Product.

136.    However, the Product was not and is not of merchantable quality or safe or fit for its intended use, because it is unreasonably dangerous and unfit for the ordinary purpose for

which it was used. Specifically, the Product is misbranded, mislabeled, and/or defective and causes Injuries as set forth herein.

137.     Defendants breached their implied warranties because the Product does not have the quality, quantity, characteristics, or benefits as promised, and because the Product does not conform to the promises made on its labels.

138.     As a direct and proximate result of one or more of these wrongful acts or omissions of the Defendants, the Plaintiff and putative Class Members suffered injuries and damages.

139.     The Plaintiff and putative Class Members were injured as a direct and proximate result of Defendants' breach because they would not have purchased the Product if they had known the true facts - the Product did not and does not have the characteristics, quality, or value as impliedly warranted.

140.     As a direct and proximate result of Defendants' breaches of these warranties, the Plaintiff and the putative Class Members Nationwide are entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and all such other relief deemed appropriate, for an amount to compensate them for not receiving the benefit of their bargain.

<u>**COUNT V**</u>
**Violation of the Alabama Deceptive Trade Practices Act**
**(CODE OF ALABAMA §§ 8-19-1, *et seq.*)**
**(On behalf of the Alabama Subclass)**

141.     Plaintiff, individually and for the Class, incorporates by reference all preceding paragraphs as though fully set forth herein.

142.     Plaintiff asserts this cause of action on behalf of the Alabama Subclass.

143. Defendants marketing, sale and/or distribution of the Products and Plaintiff's and the putative Alabama Subclass Members' purchase of the Products was a sale or distribution of goods to a consumer within the meaning of the ALABAMA DECEPTIVE TRADE PRACTICES ACT.

144. The Plaintiff and putative Alabama Subclass Members' purchased the Product for personal, family, or household use.

145. Defendants' acts and practices as described herein have misled and deceived and/or likely to mislead and deceive members of the Alabama Subclass and the general public of the State of Alabama. Defendants have advertised, marketed, and sold the Product as a "no-lye", "anti-breakage" and "intense conditioning" "rejuvenating ritual" that is "rich in vitamins in minerals", which delivers "unified results" and "reveal[s] visibly fuller, silkier hair", "protects scalp & skin" and "infuses hydration & conditioning" and other representations as set forth herein. Thus, Defendant has wrongfully:

   a. represented that its goods (*i.e., the Products*) have sponsorship, approval, characteristics, ingredients, uses benefits or qualities that they do not have;

   b. represented that its goods (*i.e., the Products"*) are of a particular standard, quality, or grade, or that its goods (*i.e., the Products"*) are of a particular style or model, if they are of another; and

   c. engaged in unconscionable, false, misleading, and/or deceptive acts and/or practices in the conduct of trade or commerce – marketing, advertising, and selling the Product.

146. By its actions, Defendant is disseminating uniform false advertising by its labeling and/or other means of marketing of the Product, which by its nature is unfair, deceptive, untrue, and/or misleading within the meaning of the ALABAMA DECEPTIVE TRADE PRACTICES ACT. Such actions are likely to deceive, do deceive, and continue to deceive the Alabama general public for all the reasons detailed herein above.

147.     Defendants intended for the Plaintiff and Alabama Subclass Members to rely on its representations and omissions and the Plaintiff and Alabama Subclass Members did rely on Defendant's misrepresentations and omissions of fact. Defendants knew the true characteristics and/or defects in the Product were unknown to and would not be readily discovered by Plaintiff and Class Members, and would not meet their ordinary, foreseeable, and reasonable expectations concerning the Product.

148.     The misrepresentations and omissions of fact constitute deceptive, false and misleading advertising in violation of the ALABAMA DECEPTIVE TRADE PRACTICES ACT.

149.     By performing the acts described herein Defendants caused monetary damage to the Plaintiff and Alabama Subclass Members of similarly situated persons.

150.     Accordingly, Plaintiff requests the following relief both individually and on behalf of the Alabama Subclass Members:

    a.    actual damages sustained by the Plaintiff and Alabama Subclass Members or the sum of $100.00, whichever is greater;

    b.    three times actual damages;

    c.    appropriate injunctive relief in the form of enjoining Defendant from continuing to violate Alabama statutory law;

    d.    attorneys' fees and costs; and

    e.    such other and further relief as the Court deems proper.

**COUNT VI**
**FRAUD**
**(On behalf of the Nationwide Class)**

151.     Plaintiff, individually and for the Class, incorporates by reference all preceding paragraphs as though fully set forth herein.

152.     Plaintiff asserts this cause of action on behalf of herself and the Nationwide Class.

153. As described herein, Defendants knowingly made material misrepresentations and omissions regarding the Product in their marketing and advertising materials, including the package in which the Product is sold and which contains the Product.

154. Defendants made these material misrepresentations and omissions in order to induce the Plaintiff and putative Class Members to purchase the Product.

155. Rather than inform consumers about the dangers and hazards associated with using the Product, Defendants represented it as not containing Lye, as a "rejuvenating ritual" that "refills as it relaxes for amazingly lively-looking hair" that "protects [the] scalp & skin," has "anti-breakage" properties, provides "unified results and superior respect for hair fiber integrity" and contains a "powerful anti-oxidant rich in vitamins and minerals." Defendants further represented the Product to be a "secret ritual for hair rejuvenation," that "will rejuvenate every strand, leaving you with thicker-looking, healthier hair," with "unique properties [that] prevent breakage, restore shine, manageability and smoothness."

156. The Product is not a safe, effective, gentler or "easier relaxing process", is not a "rejuvenating ritual" and is not free of Lye as described on the Product's packaging and other marketing materials. Rather it is composed of Lye and other ingredients that are caustic and/or allergens as described herein. Defendants knew, or should have known, that these ingredients were caustic and/or allergens and could cause scalp burning, irritation and hair loss. Defendants nonetheless failed to disclose this vital information to consumers, including the Plaintiff and putative Class Members.

157. The misrepresentations and omissions made by Defendants, upon which the Plaintiff and putative Class Members reasonably and justifiably relied, were intended to induce and did actually induce the Plaintiff and putative Class Members to purchase the Product.

158.     Defendants knew the Product contained Lye, was not a "rejuvenating ritual" that "preserv[ed] hair fiber integrity" and "prevent[ed] breakage," but nevertheless made these and other similar representations, as set forth herein, through its marketing, advertising and product labeling. In reliance on these and other similar representations, the Plaintiff and putative Class Members were induced to, and did pay monies, to purchase the Product.

159.     Had the Plaintiff and putative Class Members known the truth about the qualities and characteristics of the Product, and the dangers and hazards associated with using the Product, they would not have purchased it.

160.     As a direct and proximate result of Defendants' fraudulent acts and omissions, the Plaintiff and the putative Class Members Nationwide were injured and damaged.

161.     As a direct and proximate result of Defendants' fraudulent acts and omissions the Plaintiff and putative Class members are entitled to legal and equitable relief including compensatory and punitive damages, costs, attorneys' fees, rescission, and all such other relief deemed appropriate by the Court.

### COUNT VII
### NEGLIGENT DESIGN AND FAILURE TO WARN
### (On behalf of the Nationwide Class)

162.     Plaintiff, individually and for the Class, incorporates by reference all preceding paragraphs as though fully set forth herein.

163.     Plaintiff asserts this cause of action on behalf of herself and the Nationwide Class.

164.     At all times material to this action, Defendants were responsible for designing, formulating, testing, manufacturing, inspecting, packaging, marketing, distributing, supplying and/or selling the Product to the Plaintiff and putative Class Members.

165. At all times material to this action, the Plaintiff and putative Class Members' use of the Product was in a manner that was intended and/or reasonably foreseeable by Defendants. However, as set forth herein, use of the Product as directed by Defendants involves and continues to involve a substantial risk of sustaining Injuries.

166. At all times material to this action, the risk of sustaining Injuries was known to the Defendants or by exercising reasonable care should have been known to Defendants, in light of the generally recognized and prevailing knowledge available at the time of manufacture, design, distribution and/or sale.

167. Defendants knew—or by the exercise of reasonable care should have known—that the Product had and continues to have design defects.

168. In fact, the Product is not at all a "NO-LYE" "rejuvenating ritual" as described on the package. Rather, it is composed of Lye and other ingredients that are caustic and/or allergens as described herein. Defendants knew, or should have known, that these ingredients were caustic and/or allergens and could cause scalp burning, irritation and hair loss. Defendants nonetheless failed to disclose this vital information to consumers, including the Plaintiff and putative Class Members.

169. Defendants knew that the Plaintiff and putative Class Members - who purchased and used the Product for its intended use and as directed by Defendants - were and are members of a foreseeable class of persons who were and are at risk of suffering serious inconvenience, expense, and/or Injuries solely because of the Product's design defects.

170. Defendants, as the designers, manufacturers, distributors, marketers and/or sellers of the Product, had a duty to exercise reasonable care for the safety of the Plaintiff and putative Class Members who used, were using and/or intend to use the Product as directed by Defendants.

Since Defendants produced, manufactured, distributed, and/or sold the Product, (1) they owed a non-delegable duty to consumers, including the Plaintiff and putative Class Members, to exercise ordinary and reasonable care to properly design the Product, and (2) they had a continuing duty to warn about the characteristics, ingredients, dangers, hazards, and/or risks of suffering Injuries associated with the intended use of the Product, as directed by Defendants and as specifically described herein.

171.    Defendants have received hundreds or more consumer complaints of Injuries resulting from use of the Product. Upon learning of these complaints, an additional, independent duty arose; to provide a warning to consumers that use of the Product as intended could result in Injuries.

172.    Notwithstanding the aforementioned duties, Defendants were negligent by one or more of the following acts or omissions in that the Defendants:

    a.    Failed to provide adequate warnings to purchasers and users of the Product, including the Plaintiff and putative Class Members, regarding the risks and potential dangers of using the defective Product as directed by Defendants;

    b.    Failed to provide adequate warnings to purchasers and users of the Product, including the Plaintiff and putative Class Members, that the Product contained Sodium Hydroxide, a highly caustic[48] substance that is very corrosive, has acute toxicity to the skin, is harmful when it contacts the skin, causing severe skin burns, skin irritation, redness, pain, and blisters.

    c.    Failed to provide adequate warnings to purchasers and users of the Product, including the Plaintiff and putative Class Members, that the Product contained a Lithium Chloride, a highly caustic[47] substance that is

---

[48] "Caustics" are "[s]trong alkaline chemicals that destroy soft body tissues resulting in a deep, penetrating type of burn, in contrast to corrosives, that result in a more superficial type of damage via chemical means or inflammation." NATIONAL INSTITUTES FOR HEALTH'S CENTER FOR BIOTECHNOLOGY INFORMATION (*a division of the National Library of Medicine*). https://pubchem.ncbi.nlm.nih.gov/compound/14798#section=Pharmacology-and-Biochemistry

very corrosive, has acute toxicity to the skin, is harmful when it contacts the skin, causing severe skin burns, skin irritation, redness, pain, and blisters;

b.     Failed to provide adequate warnings to purchasers and users of the Product, including the Plaintiff and putative Class Members, regarding other characterizes and ingredients of the Product, including, but not strictly limited to, ingredients that are caustic to the skin and cause skin corrosion, skin irritation, dermatitis, sensitization and other acutely toxic damages and/or injuries to the skin when using the defective Product as directed by Defendants;

c.     Failed to recommend and/or provide proper warnings to ensure the safety of the Plaintiff and putative Class Members of using the defective Product as directed by Defendants;

d.     Failed to adequately investigate the safety hazards associated with the intended use of the Product;

e.     Negligently designing a Product with serious safety hazards and risks;

f.     Failed to accurately advise that despite the representation the Product contained "NO-LYE", the Product did in fact contain Lye;

g.     Oversold the value and benefits of the Product while minimizing the true risks of suffering Injuries associated with use of the Product, as directed by Defendants.

173.     Therefore, Defendants knew, or by the exercise of reasonable care should have known (1) of the inherent design defects and resulting hazards and dangers associated with using the Product as directed by Defendants, and (2) that the Plaintiff and putative Class Members could not reasonably be aware of those risks. Thus, Defendants failed to exercise reasonable care in providing Class Members with adequate warnings regarding the potential for sustaining Injuries when using the Product as directed by Defendants.

174.     As a direct and proximate result of Defendants' negligent design and failure to adequately warn consumers of the true characteristics of the Product, the true risks associated with using the Product as directed by Defendants, and that use of the Product as directed by the

Defendants could cause Injuries, the Plaintiff and putative Class Members have suffered damages as set forth herein.

175.    As a direct and proximate result of Defendants' negligent design and failure to adequately warn consumers of the true characteristics of the Product, the true risks associated with using the Product as directed by Defendants, and that use of the Product as directed by the Defendants could cause Injuries, the Plaintiff and putative Class members are entitled to legal and equitable relief including compensatory and punitive damages, costs, attorneys' fees, rescission, and all such other relief deemed appropriate by the Court.

## PRESERVATION CLAIMS

176.    Plaintiff, individually and for the Class, incorporates by reference all preceding paragraphs as though fully set forth herein.

177.    To the extent that Defendants may claim that Plaintiff and/or the Class Members' claims are barred by the applicable statute of limitations, Plaintiff and the Class Members assert that the statute of limitations is and has been tolled by, *inter alia*, Plaintiffs and the Class Members' discovery that their injuries were directly and proximately caused by the Product and Defendants' failure to properly and adequately warn of the true risks and dangers associated with use of the Product, as set forth *supra*, and/or after any actionable Injury(ies) was/were sustained by Plaintiffs and/or the putative Class Members.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

      a.    For an order certifying the Class under FEDERAL RULE OF CIVIL PROCEDURE 23;

      b.    For an order and naming the Plaintiff as representative of the Class and Subclass;

c.     For an order naming Plaintiff's counsel as Class Counsel to represent the Class and Subclass;

d.     For an order declaring that Defendants' conduct violates the statutes and/or laws referenced herein;

e.     For an order finding in favor of the Plaintiff, the Class and the Subclass on all counts asserted herein;

f.     For compensatory, statutory, and punitive damages in amounts to be determined by a jury and/or the Court;

g.     For prejudgment interest on all amounts awarded;

h.     For an order of restitution and all other forms of equitable monetary relief, including disgorgement of all profits and ill-gotten monetary gains received by Defendants from sales of the Product;

i.     For an order enjoining Defendants from continuing the unlawful practices detailed herein; and

j.     For an order awarding the Plaintiff, the Class and the Subclass their reasonable attorneys' fees and expenses and costs of suit.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands trial by jury on issues so triable.


Respectfully submitted, this the 9th day of January, 2017.


> /s/ W. Lewis Garrison, Jr.
> W. Lewis Garrison, Jr.
> wlgarrison@hgdlawfirm.com
> Brandy Lee Robertson
> brandy@hgdlawfirm.com
> HENINGER GARRISON DAVIS, LLC
> 2224 First Avenue North
> Birmingham, AL 35203
> Telephone: 205-326-3336
> Facsimile: 205-380-8072

K. Stephen Jackson
steve@jacksonandtucker.com
Joseph L. Tucker
josh@jacksonandtucker.com
JACKSON & TUCKER, P.C.
2229 1st Ave. North
Birmingham, AL 35203-4203
Telephone: 205.252.3535
Facsimile: 205.252.3536

## CERTIFICATE OF SERVICE

I hereby certify that I have this 9th day of January, 2017, served a copy of the foregoing upon all parties to this matter by electronically filing the same with the Court's CM/ECF electronic filing system, which will cause a copy to be electronically served on all counsel of record.

/s/ Brandy Lee Robertson
Brandy Lee Robertson
brandy@hgdlawfirm.com
HENINGER GARRISON DAVIS, LLC
2224 First Avenue North
Birmingham, AL 35203
Telephone: 205-326-3336
Facsimile: 205-380-8072