**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| ANGELA CARTER, ELLA VALRIE, and DORA BLACKMON, individually and on behalf of others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | |
| vs. | ) | CIVIL ACT. NO. 2:16-cv-508-TFM-B |
| | ) | |
| L'OREAL USA, INC., and SOFT SHEEN-CARSON, LLC, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Now pending before the Court are (1) Plaintiffs' Motion to Strike the November 29, 2018 Declaration of Barbara Mitchell (Doc. 234, filed 11/13/19), (2) Defendants' Amended Motion for Summary Judgment (Doc. 228, filed 10/21/19); and Plaintiffs' Amended Motion for Class Certification and Amended Motion to Appoint Class Counsel (Docs. 212, 214, filed 8/30/19). The parties had the opportunity to provide responses and replies to each motion. The Court has reviewed all the written pleadings, motions, responses, replies, and other documents and the relevant law. For the reasons articulated below, the motion to strike (Doc. 234) is **GRANTED IN PART and DENIED IN PART**; the amended motion for summary judgment (Doc. 228) is **GRANTED**, the motion for class certification (Doc. 212) is **DENIED**, and the motion for appointment of class counsel (Doc. 214) is **DENIED AS MOOT**.

### I.    PARTIES AND JURISDICTION

The plaintiffs—Angela Carter ("Carter"), Ella B. Valrie ("Valrie"), and Dora Blackmon ("Blackmon") (collectively, "Plaintiffs"), individually and on behalf of a putative class—assert

claims pursuant to 28 U.S.C. § 1332(d), under which district courts have original jurisdiction over any civil class action where the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and any member of a class of plaintiffs is a citizen of a state different from that of any defendant. *See* 28 U.S.C. § 1332(d)(8) ("This subsection shall apply to any class action before or after the entry of a class certification order by the court with respect to that action."). The parties do not contest either subject matter or personal jurisdiction and adequate support exists for both.

## II.   BACKGROUND AND PROCEDURAL HISTORY

Carter filed this action on September 30, 2016, on behalf of herself and similarly situated individuals, raising various claims against the defendants, L'Oreal USA, Inc. ("L'Oreal"), and Soft Sheen-Carson, LLC ("Soft Sheen") (collectively, "Defendants"). Doc. 1. Cases brought by Blackmon and Valrie[1] – eventually were consolidated with Carter's. Docs. 38, 48, 88. In the second amended complaint[2] filed on January 9, 2017, Plaintiffs assert various claims against Defendants in relation to the Amla Legend Rejuvenating Ritual Relaxer Kit ("relaxer kit"), a hair-relaxer kit marketed primarily to African American women and sold nationally through various retailers under the Soft Sheen-Carson Optimum Salon Haircare brand. Doc. 29.

The relaxer kit has five (5) components—scalp protector, relaxer base, neutralizing shampoo, conditioner, and oil moisturizer—which consumers are instructed to apply in order and in a single session to achieve the desired result. Plaintiffs assert that the product is promoted as an

---

[1] A fourth plaintiff, Geraldine J. Smith, was dismissed from the case on July 20, 2018. *See* Doc. 108.

[2] The second amended complaint (Doc. 29) was filed by Carter, individually and on behalf of others similarly situated. Blackmon and Valrie filed complaints in their cases that have been placed on the docket in this consolidated case and are virtually identical to Carter's second amended complaint. Docs. 39, 46-1. Accordingly, Carter's second amended complaint will serve as the operative complaint for purposes of the pending motions.

"easy no-mix, no-lye relaxer kit that ensures an easier relaxing process for unified results and superior respect for hair fiber integrity," and the line of Amla Legend products, of which the relaxer kit is a part, and the amla oil for which they are named, are variously promoted as a "secret ritual for hair rejuvenation" with "intense moisture [that] will rejuvenate every strand, leaving you with thicker-looking, healthier hair," and with "unique properties [that] prevent breakage, restore shine, manageability and smoothness." *Id*. at 1-2. Plaintiffs allege that, contrary to those assertions, the relaxer kit causes significant hair loss and skin and scalp irritation, including burns and blistering, due to an inherent design or manufacturing defect.

Plaintiffs aver that, despite the "no-lye" representations on the relaxer-kit packaging, the relaxer kit actually contained sodium hydroxide (commonly referred to as "lye") and the instructions for applying the product, and for pre-testing the product on a strand of hair (the "strand test") are inadequate. Plaintiffs assert that the product contains caustic and/or dangerous ingredients that can lead to the injuries stated and is unfit for its intended use. Further, Plaintiffs assert Defendants failed to disclose material information to consumers regarding the dangers of the product and, instead, made material misrepresentations as to the characteristics, ingredients, safety, and value of the product. Finally, Plaintiffs state that they would not have purchased the relaxer kit if Defendants had adequately disclosed the dangers associated with it.

Accordingly, in their operative Second Amended Complaint (Doc. 29) ("operative complaint"),[3] Plaintiffs asserted six (6) claims against Defendants: (1) violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301-2312 (Count II); (2) breach of express warranty (Count III); (3) breach of implied warranty (Count IV); (4) violation of the Alabama Deceptive Trade Practices Act ("ADTPA"), ALA. CODE §§ 8-19-1 through 8-19-15 (Count V); (5) fraud (Count

---

[3] *Supra* note 2.

VI); and (6) negligent design and failure to warn (Count VII).[4]  Doc. 29.  Plaintiffs seek damages and equitable remedies on behalf of themselves and the putative class of consumers who bought the relaxer kit.

Plaintiffs filed a motion for class certification and a motion to appoint class counsel on December 7, 2018.  Docs. 148-150.  That same day, Defendants filed a motion for summary judgment seeking dismissal or partial dismissal of all the claims asserted by Plaintiffs as well as all claims for injunctive and declaratory relief and punitive damages.  Docs. 154-159.  Beginning on December 7, 2018, the parties filed a succession of motions seeking to exclude expert witness reports and testimony, and other motions related to expert witnesses.  *See* Docs. 151, 164, 166, 168, 171, 181, 183, 187, 194, 195, 197, 201, 207.  The parties had the opportunity for responses and replies, a hearing was held, and the Court ruled.  Docs. 205, 211.  Following the Court's omnibus order excluding portions of expert reports and testimony, the parties were instructed to file amended motions for class certification, appointment of class counsel, and summary judgment, making any necessary changes in light of the Court's Order.  Doc. 211.

Accordingly, Plaintiffs filed the instant amended motion for class certification and amended motion to appoint class counsel, which superseded their prior motions for class certification and appointment of class counsel.  Docs. 212-214.  Defendants responded to the class certification motion on September 20, 2019, and Plaintiffs replied on September 27, 2019.  Docs. 220, 221.

On September 3, 2019, Defendants filed an amended motion for summary judgment that incorporated by reference the prior motion for summary judgment.  Doc. 215.  Those combined

---

[4] Count I, for unjust enrichment, was dismissed by the Court on September 6, 2017.  *See* Docs. 51, 60.

motions for summary judgment were granted as to Count II, violation of the Magnuson-Moss Warranty Act; Count III, breach of express warranty; Count IV, breach of implied warranty; and Count V, violation of the ADTPA.  Doc. 223.  Defendants were instructed to re-file their motion for summary judgment on the remaining claims – Count VI, for fraud, and Count VII, for negligent design and failure to warn – in a single, comprehensive document.

Accordingly, Defendants filed the instant amended motion for summary judgment on October 21, 2019.  Doc. 228.  Plaintiffs responded on November 13, 2019, and Defendants replied on November 20, 2019.  Docs. 232, 236.  Plaintiffs filed the pending motion to strike in conjunction with their response.  Doc. 234.  Defendants responded on November 20, 2019, and Plaintiffs replied on November 27, 2019.  Docs. 237, 238.  Thus, the pending motions are ripe for review.

### III.   MOTION TO STRIKE

In their motion, Plaintiffs ask the Court to strike from the record (1) a November 29, 2018 declaration by Barbara Mitchell, manager of L'Oreal's Texture & Styling Laboratory, and (2) sixty-seven (67) pages of manufacturing records filed in conjunction with Mitchell's declaration. The Court will address each in turn.

### A.   Barbara Mitchell's declaration

Plaintiffs argue that Mitchell's declaration should be struck because it was filed more than a month after discovery closed, and thus, they were unable to cross-examine Mitchell regarding its contents.  Plaintiffs note that, during discovery, they were forced to file a motion to compel in order to obtain deposition dates for Mitchell and others.  They assert that Mitchell testified in an earlier case involving the relaxer kit in August 2017 that she was aware of the existence of relevant manufacturing records, but apparently she did not examine them prior to executing a previous declaration in that case.  Plaintiffs argue that her declaration in this case, in which she references

the manufacturing records, contradicts the earlier one.

In response, Defendants argue, first, that Plaintiffs should have raised any objection to Mitchell's declaration when Defendants filed their first motion for summary judgment in December 2018, noting that this new round of briefing was prompted solely by the Court's instruction that the parties refile briefs to conform with its prior omnibus order resolving *Daubert* motions and granting partial summary judgment. Defendants argue that, in light of this procedural stance, Plaintiffs' objections are untimely and have been waived.

Alternatively, Defendants argue that the motion should be denied because Plaintiffs had more than two years to depose Mitchell and elected not to do so. Defendants aver that they offered dates for Mitchell's deposition, but Plaintiffs opted, instead, to rely on a deposition transcript from earlier litigation involving the relaxer kit in the Southern District of New York. Defendants assert that, because Plaintiffs elected not to depose Mitchell, Defendants were required to rely on Mitchell's declaration to support their summary judgment motion.

First, Plaintiffs' argument to strike Mitchell's declaration rests largely on the assertion that she was not deposed during discovery in this case. However, Plaintiffs provide no legal support for the argument. They assert that they had to file a motion to compel in order to receive possible deposition dates for Mitchell and other lay witnesses. Indeed, the record shows Plaintiffs filed a motion to compel that sought, among other things, such dates. *See* Docs. 114, 127. However, the record also reflects that the assigned Magistrate Judge ordered Defendants to provide such dates and Defendants complied with the Court's Order. Docs. 127, 128, 229-34. Further, copies of email correspondence supplied by Defendants demonstrate that Plaintiffs elected not to depose Mitchell and, instead, relied on testimony Mitchell provided in an earlier federal case. Thus, it is clear that Plaintiffs were not prevented from deposing Mitchell; they chose not to do so. Plaintiffs

do not contest this point.

Plaintiffs also take issue with the fact that Mitchell's declaration was not executed until November 29, 2018,[5] noting that discovery was completed in this case on October 31, 2018 and Plaintiffs were not made aware of the declaration until it was filed with the Court on December 7, 2018 in support of Defendants' initial motion for summary judgment. *See* Doc. 159-23. However, Plaintiffs again provide no legal support for their assertion that executing the declaration after the close of discovery warrants striking it from the evidentiary record, particularly as (1) Plaintiffs did not object to the declaration in their response to Defendants' initial motion for summary judgment and (2) Plaintiffs, in fact, cited to the declaration in their initial response. *See* Doc. 172 at 3. Plaintiffs argue that they did not have an opportunity to cross-examine Mitchell on issues contained in her declaration, but the parties had ample time for discovery and, again, Plaintiffs had an opportunity to depose Mitchell during the discovery period and declined to do so. Moreover, there is no indication in the record that Plaintiffs sought leave to depose Mitchell after becoming aware of the declaration in 2018, or that Plaintiffs took issue with the declaration at all until their response to Defendants' amended motion for summary judgment was filed many months later on September 9, 2019. Doc. 216 at 6-8.

As to Plaintiffs' argument that Mitchell's declaration contradicts her prior testimony, Plaintiffs do not explain in the first instance why any discrepancies, if they exist, between Mitchell's November 29, 2018, declaration and her prior testimony in a separate case should be resolved by striking the more recent declaration and keeping the prior testimony. Moreover, the only contradiction alleged by Plaintiffs is Mitchell's statement in the November 29, 2018

---

[5] Plaintiffs state in the motion that the declaration was executed on November 28, 2018. The date on the declaration, however, is November 29, 2018.

declaration that:

> [i]n fact, no sodium hydroxide was added to any production batches of the Relaxer's shampoo component because no production batches required upward pH adjustment, as confirmed by L'Oreal's production records corresponding to the individual production batches. … The records confirm that each production batch tested within the acceptable pH range of 5.0 to 6.0 without requiring the addition of any sodium hydroxide.

Doc. 229-23 ¶ 8.  Plaintiffs do not explain, and the Court fails to see, how this contradicts anything in Mitchell's January 19, 2018 declaration, or any of the other documents cited by Plaintiffs in the motion to strike—a prior deposition of Mitchell in the Southern District of New York case, prior declarations by Mitchell filed in separate Southern District of New York cases, the expert report of Mort Westman in this case, and various relaxer kit packaging information.  *See* Docs. 172-4, 172-7, 172-10, 212-6, 212-8, 212-15.  To the extent Plaintiffs argue that Mitchell's statement constitutes a change in her opinion from earlier testimony, it is not an opinion.  It merely provides additional information.  Accordingly, the motion to strike Mitchell's declaration is due to be denied.

## B.    Manufacturing records

As to the manufacturing records, Plaintiffs argue they should be excluded as violative of Fed. R. Civ. P. 34(a)(1)(A) and 34(b)(2)(E) because they were not produced in a "reasonably usable form." Doc. 234 at 4.  Specifically, the records are in French, do not contain Bates numbers, and were not "properly authenticated."  *Id*. at 1-2.  Rule 34(a)(1)(A) provides that "[a] party may serve on any other party a request … [t]o produce and permit the requesting party or its representative to inspect, copy, test, or sample … any designated documents or electronically stored information … stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form." FED. R. CIV. P. 34(a)(1)(A).  Rule 34(b)(2)(E) details appropriate procedures for producing such

documents.  However, these rules apply to discovery, which was completed in October 2018.  As Defendants argue, Plaintiffs had ample time to object to the documents at that point.  Indeed, the record demonstrates that Plaintiffs did object to the French-language discovery documents produced by Defendants in October 2018, but subsequently abandoned their objection.  *See* Docs. 115, 127.  Moreover, Plaintiffs did not object to the use of the documents in support of Defendants' initial motion for summary judgment.  *See* Doc. 172.

Nevertheless, summary judgment rules indicate that a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  FED. R. CIV. P. 56(c)(2).  Regardless of any other deficiencies alleged by Plaintiffs, Defendants have submitted manufacturing records in French with no translation.  The Court does not speak French.  Thus, the records are meaningless as support for Defendants' motion.  Although Mitchell references the documents in her declaration, she does not purport to translate the documents directly.  Thus, the documents will not be considered by the Court.  The Court notes that, to the extent the documents are included to support Defendants' assertion that no sodium hydroxide was included in the relaxer kits at issue, they are also unnecessary, as there is uncontroverted evidentiary support for the assertion elsewhere in the record.  Thus, the motion to strike is granted as to the manufacturing records.

## IV.   MOTION FOR SUMMARY JUDGMENT

### A.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary

judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). "[T]he substantive law will identify which facts are material." *Id*. at 248, 106 S. Ct. at 2510. At the summary judgment stage, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Id*. at 249, 106 S. Ct. at 2511. The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH–Siegen,* 965 F.2d 994, 999 (11th Cir.1992) (internal citations and quotations omitted). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Mize v. Jefferson City Bd. of Educ*., 93 F.3d 739, 742 (11th Cir. 1996) (citing *Hairston v. Gainesville Sun Publ'g Co*., 9 F.3d 913, 918 (11th Cir. 1993)). For factual issues to be considered genuine, they must have a real basis in the record. *Id*.

The party asking for summary judgment bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id*. at 322-23, 106 S. Ct. at 2252. A party must support its assertion that there is no genuine issue of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). The admissibility of evidence is subject to the same standards and

rules that govern admissibility of evidence at trial. *Clemons v. Dougherty County*, 684 F.2d 1365, 1369 n.5 (11th Cir. 1982) (citing *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir. 1980)).

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995) (internal quotations omitted) (citing *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553). The court must view facts and draw all reasonable inferences in favor of the non-moving party. *Moore v. Reese*, 637 F.3d 1220, 1231 (11th Cir. 2011) (citing *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007)). However, to avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (citations omitted). Conclusory assertions, unsupported by specific facts, presented in affidavits opposing the motion for summary judgment are likely insufficient to defeat a proper motion for summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990).

Finally, Fed. R. Civ. P. 56(e) also provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order." FED. R. CIV. P. 56(e).

### B.    Abandonment of Claims VI and VII

Defendants argue, first, that summary judgment is warranted because Plaintiffs have abandoned the remaining fraud and negligence claims from their operative complaint and, instead, have alleged—in their prior opposition to summary judgment, their more recent briefing on the pending motion for class certification, and statements made during a prior *Daubert* hearing— unpled claims that Defendants violated the Food, Drug, and Cosmetic Act ("FDCA"), the Fair Packaging and Labeling Act ("FPLA"), or related regulations of the U.S. Food and Drug Administration ("FDA").  Defendants assert that Plaintiffs' operative complaint makes no mention of the FPLA, and makes note of the FDCA not as a cause of action, but merely as evidence that Plaintiffs' reliance on the relaxer kit's labeling and design was justifiable.  Defendants argue that Plaintiffs' negligence claim requires a showing that Defendants breached a duty of reasonable care and does not involve any duty imposed by federal statutes or regulations.  Defendants argue that Plaintiffs are, in effect, attempting to amend their operative complaint, which is impermissible at this late stage.

First, Plaintiffs concede that they do not seek to enforce a private right of action under the FDCA or the FPLA.[6]  Rather, they seek to demonstrate that Defendants had a duty to comply with the requirements of the federal statutes, and that failure to do so evidences a breach of Defendants' duty to provide consumers with truthful information about their product.  Moreover, Plaintiffs have not sought to amend their operative complaint to add any such cause of action.  Thus, to the extent Defendants argue that Plaintiffs have abandoned their remaining claims in favor of asserting claims under the FDCA or FPLA, the Court disagrees.  While making no findings at this point on the

---

[6] To the extent that Plaintiffs do seek to add claims under the FDCA or FPLA, they have not sought leave from the Court to amend their operative complaint, and thus, any such claims are disregarded.

merits of Plaintiffs' argument, the Court determines that Plaintiffs' reliance on these federal statutes in their opposition to summary judgment is not an attempt to abandon their remaining claims in favor of unpled causes of action, but rather, an attempt to bolster their claims by invoking federal standards.

### C.    Fraud (Count VI)

Plaintiffs allege in the operative complaint that Defendants made material representations and omissions regarding the relaxer kit in the product packaging and the marketing and advertising materials promoting the product.  Doc. 29.  Specifically, they allege the following:

(1) Defendants failed to inform consumers about the dangers of the product—specifically, that it contains lye and other ingredients that are caustic and/or allergens and could cause scalp burning, irritation, and hair loss;

(2)  Defendants falsely represented that the relaxer kit contained no lye, or sodium hydroxide; when it actually contains sodium hydroxide and other caustic ingredients; and

(3) Defendants falsely claimed that the product:

    a.   is a "rejuvenating ritual" that "refills as it relaxes for amazingly lively-looking hair";

    b.   "protects [the] scalp & skin,"

    c.   has "anti-breakage" properties;

    d.   provides "unified results and superior respect for hair fiber integrity";

    e.   contains a "powerful anti-oxidant rich in vitamins and minerals";

    f.   is a "secret ritual for hair rejuvenation" that "will rejuvenate every strand, leaving you with thicker-looking, healthier hair"; and

      g.  has "unique properties [that] prevent breakage, restore shine, manageability and smoothness."

*Id*. ¶¶ 153-156.  Plaintiffs allege that they reasonably relied on these representations and were induced to purchase the relaxer kit on that basis, and they were injured as a result.

      Defendants assert that Plaintiffs' fraud claims should be dismissed because Plaintiffs cannot show that Defendants deceived consumers.  Specifically, Defendants argue that Plaintiffs' allegations that the product was misrepresented as a "no-lye relaxer" are unfounded because Defendants' evidence demonstrates that the products in question contained no sodium hydroxide and Plaintiffs produced no evidence to the contrary.  Defendants assert that, even setting aside Mitchell's testimony, the manufacturing records, the master formula, and other evidence, summary judgment would be proper because the "no-lye" representation applies to the relaxer cream component, not the shampoo, and thus, the assertion that the product is a "no-lye relaxer" is accurate, because the relaxer component contained no sodium hydroxide.

      Defendants further argue that they never represented that the relaxer kit was risk-free, or that it was safer, less harsh, healthier, or gentler than other chemical hair relaxers.  Defendants assert that Plaintiffs have no evidence that consumers interpreted any representations by Defendants in such a way.  Defendants aver that evidence in the record refutes Plaintiff's allegations that Defendants' marketing materials touting the benefits of amla oil or the relaxer kit generally are misleading.  For example, Defendants note that a majority of subjects in a blind test found that the product left their hair "visibly fuller," "feeling nourished," or "looking rejuvenated." Defendants assert that, indeed, Plaintiffs themselves testified to the cosmetic value of the shampoo, conditioner, and oil moisturizer components.

      Defendants also contend that Plaintiffs have failed to establish any link between causation

and any actual loss, first, because Plaintiffs concede that they cannot demonstrate personal injury. Instead, Plaintiffs claim loss of the economic value of the product. However, Defendants argue that the economic value was lost due to Plaintiffs' misuse of the product. Defendants argue that, in any case, Plaintiffs provide no evidence to establish an appropriate loss amount.

Under Alabama law, legal fraud is defined as a "misrepresentation[] of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party." ALA. CODE § 6-5-101. Establishing a *prima facie* case for fraud therefore requires a plaintiff to show: "(1) a false representation, that is, proof that the defendant made an untrue statement; (2) of an existing material fact; (3) that the plaintiff reasonably relied upon; and (4) that plaintiff was damaged as a proximate result of the reliance." *Bodie v. Purdue Pharma Co.,* 236 F. App'x 511, 524 (11th Cir. 2007) (citing *Prestwood v. City of Andalusia,* 709 So. 2d 1173, 1175 (Ala.1997)).

The Eleventh Circuit has also stated that fraud claims brought in federal court require a higher threshold of specificity pursuant to Fed. R. Civ. P. 9(b). *Id.* The Eleventh Circuit has construed the rule to require that a plaintiff alleging fraud assert:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same; and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Id.* (internal citation and quotations omitted).

A plaintiff must present "evidence supporting each element of the claim in question" to survive summary judgment. *Lucky Mfg. Co. v. Activation, Inc.,* 406 So. 2d 900, 904 (Ala. 1981) (citing *State Sec. Life Ins. Co. v. Henson*, 262 So. 2d 745 (1972)). "It is a well-established principle that if a legitimate inference furnishes a scintilla of evidence in support of the theory of a claim in

the complaint, that claim must go to the jury.  It is equally well-established, however, that where there is no legitimate evidence supporting the charge made by the claim, but rather the evidence shows the claim is based on speculation and conjecture, then, in that event, the claim should not be submitted to the jury." *Id.* (citing *Perdue v. Mitchell*, 373 So. 2d 650 (Ala. 1979); *Whaley v. Lawing*, 352 So. 2d 1090 (Ala. 1977); *Commercial Fire Ins. Co. of N.Y. v. Parvin*, 189 So. 2d 330 (1966)).

As an initial matter, Plaintiffs' argument that Defendants omitted material warnings about the dangers of the product—and, indeed, the bulk of Plaintiffs' remaining claims—are premised on the notion that Defendants falsely represented the relaxer kit as "no lye" in packaging and marketing materials, meaning it contains no sodium hydroxide.  However, Plaintiffs' only evidence in support of their assertion is the relaxer kit packaging, which states on the front that it is a "no-lye" relaxer but, in an apparent contradiction, lists sodium hydroxide—otherwise known as lye—as the last ingredient in its neutralizing shampoo component. *See, e.g.*, Doc. 229-1.[7]

To explain the disparity on the relaxer kit packaging, Defendants offer that the product is advertised as "no-lye" because the active ingredient in the relaxer is not sodium hydroxide but a milder alternative, lithium hydroxide.  They state that sodium hydroxide is listed as an ingredient on the back of the box because it *could* be used in small amounts in some batches of the shampoo in order to adjust the pH level to reduce acidity where needed.  Evidence in the record supports

---

[7] Defendants include among their exhibits reproductions of three (3) versions of the relaxer kit cartons that were approved by L'Oreal for distribution throughout the United States—released for printing in 2012, 2014, and 2015, respectively—and two (2) instruction inserts.  The reproductions are included in the record as Docs. 229-1 through 229-5 and are authenticated by Patricia Cumberland, vice president of creative services for L'Oreal, in a sworn declaration in which she notes that the newer carton designs did not supersede older stock, so all three (3) versions of the relaxer kit carton could have been in circulation simultaneously.  Doc. 229-6.  Any differences among the cartons are inconsequential for purposes of this opinion.

this assertion.  Mitchell, in her declaration, states the following:

> Sodium hydroxide, commonly known as lye, is frequently added in small amounts in the production of shampoo and many other personal care products, including most baby shampoos, in order to adjust the pH value of a given production batch. Adding sodium hydroxide will adjust the pH value upward, rendering the production batch to which it is mixed less acidic.
>
> 5. In the ingredient lists on the Relaxer's exterior packaging cartons, sodium hydroxide appears as the last and least substantial ingredient of the neutralizing shampoo component of the Relaxer kit because there was a possibility that product technicians would be required to add a small quantity of sodium hydroxide to any given production batch of the shampoo in order to adjust its pH value to within the formulation's acceptable range.

Doc. 229-23 ¶¶ 4-5.  Mitchell goes on to say:

> 6. The addition of any such sodium hydroxide would have been solely to balance the pH of the shampoo component, and would not have been added for the purposes of straightening or relaxing hair, as with lye-based relaxer creams that use sodium hydroxide as their active straightening or relaxing agent.
>
> 7. The formulation of the Relaxer's shampoo component confirms this. This shampoo's formulation specifies the concentration of sodium hydroxide to be zero.  This is because sodium hydroxide was merely a potential ingredient to be added if necessary to adjust the pH of a given batch.

*Id*. ¶¶ 6-7.  Defendants offer, in further support of their argument, the master formula for the relaxer kit, which Mitchell authenticates in her declaration.  *Id*. ¶ 7; *see also* Doc. 229-24.  The master formula, filed under seal, confirms Mitchell's assertion that sodium hydroxide is listed as an ingredient only of the shampoo portion, in an amount of "0".  Doc. 229-24 at 2.

Whether the "no-lye" statement on the packaging would constitute a misrepresentation where trace amounts of sodium hydroxide are added to balance the pH in the shampoo is a question that need not be answered here, however, because Defendants also offer evidence that the relaxer kits never required the addition of sodium hydroxide to the shampoo component.[8]  Mitchell further

---

[8] The Court notes, however, that even if the presence of sodium hydroxide in trace amounts could constitute a misrepresentation of a material fact, and if sodium hydroxide had been added to the

testifies in her deposition that "no sodium hydroxide was added to any production batches of the Relaxer's shampoo component because no production batches required upward pH adjustment, as confirmed by L'Oreal's production records corresponding to the individual production batches." *Id*. ¶ 8.  In a sealed report, Defendants' expert Mort Westman, a cosmetics-industry research and development consultant who provides product formulation and development services, reaches the same conclusion, stating, "Review of manufacturing records show[s] that such upward adjustment of batch-pH was never necessary and thus Sodium Hydroxide was never added to, or used in, a batch of Neutralizing Shampoo."[9]  Docs. 229-8, 230-1.

Although the Court has struck the manufacturing records from the record for the reasons previously stated, Mitchell's testimony and Westman's expert report provide uncontroverted evidence that sodium hydroxide was not added to any of the relaxer kits.  Plaintiffs provide no evidence to counter Defendants' showing.  Plaintiffs did not test any relaxer kits to determine whether they contained sodium hydroxide, nor have they provided any witness testimony, documentation or other evidence inferring such, apart from the representations on the relaxer kit box.  Plaintiffs' expert, Randall Tackett, a toxicologist and pharmacologist, concludes in his expert report that the representation that the relaxer "does not contain lye in large bold type on the product kit is false and misleading."  Doc. 229-11 at 8.  However, Tackett states in his deposition that he did not perform any chemical analysis of the relaxer kit or open any of the individual components

---

relevant batches in that manner, Plaintiffs have made no assertion that, nor provided evidence to suggest, the shampoo component of the relaxer kit caused the injuries alleged, or such trace amounts of sodium hydroxide could have caused the injuries alleged, as required for fraud.

[9] The Court notes that Westman's report was previously sealed.  Because portions of the report referenced in this opinion are directly relevant to the issues raised by the parties, the Court unseals only those portions of the report referenced here for purposes of this opinion.  The remainder of the report remains sealed.

of the kit in developing his opinion.  Doc. 229-26 at 5-6.  Rather, Tackett testifies that his opinion

that the "no-lye" label is misleading is based merely on reading the "no-lye" representation on the

box and the ingredients lists provided on the relaxer-kit components.  Doc. 229-26 at 25.

Consequently, Plaintiffs offer no evidence to create a dispute regarding a material fact—

specifically, that the product that injured the plaintiffs did, in fact, potentially contain sodium

hydroxide.  *See Prestwood v. City of Andalusia*, 709 So. 2d 1173, 1175 (Ala. 1997) (citation

omitted) ("A false statement is an essential element of fraud.  This Court has held that 'there can

be no liability for fraud without proof that the defendant made an untrue statement.'").  Rather, the

evidence remains uncontroverted that the product the Plaintiffs allege caused their injuries did not

contain sodium hydroxide.  There is no support in the record for Plaintiffs' assertion that

Defendants made a false statement in regard to the "no-lye" assertion on the box or, by extension,

that Plaintiffs were injured by any such assertion—another necessary element of a fraud claim.

Thus, Plaintiffs have failed to present evidence in support of at least two (2) of the necessary

elements of fraud, and their claim fails as a matter of law.  *See Celotex*, 477 U.S. at 323, 106 S.

Ct. at 2552.

Plaintiffs also contend that the product contains "other caustic and/or dangerous ingredients

that can and do cause" the same types of injuries, and that Defendants "failed to take reasonable

steps to disclose to and/or warn [Plaintiffs] and putative Class Members of the dangers associated

with the use of the Product."  Doc. 29 ¶¶ 10, 12.  Specifically, Plaintiffs take issue with the

inclusion of lithium hydroxide—the active ingredient in the relaxer that Plaintiffs' own expert

concedes is a gentler alternative to sodium hydroxide—asserting that it, too, is caustic and can

produce the same injuries as sodium hydroxide.  *Id.* ¶ 45; *see also* Doc. 229-26 at 7-8.  Plaintiffs

contend that, because the product is intended to be applied to users' hair, there is "no avoiding

potentially harmful skin contact." *Id*.  Plaintiffs also list in their operative complaint other ingredients present in the relaxer kit that they allege are caustic and potentially harmful to consumers, as follows: hexylene glycol, cocamidopropyl betaine, polyethylene glycol, polybutylene glycol, potassium sorbate, disodium EDTA, sodium laureth sulfate, polysorbate 20, polysorbate 60, benzyl salicylate, methylisothiazolinone, limonene, propylene glycol, and diethylhexyl maleate. *Id*. ¶ 47.  Plaintiffs assert that Defendants fraudulently omitted the dangers associated with the use of the product and, in tandem with that, falsely marketed the relaxer kit as a safe, effective, gentler or easier relaxing process and a rejuvenating ritual.  *Id*. ¶¶ 155-58.

Here again, much of Plaintiffs' argument focuses on the alleged use of sodium hydroxide. Nevertheless, to the extent Plaintiffs attempt to raise a fraud claim based on a failure to disclose the risks of the relaxer kit generally and, instead, falsely tout benefits that do not exist, this claim also must fail as a matter of law.  First, the operative complaint fails to state the claim with requisite specificity.  Plaintiffs do not state precisely which statements were made where, or specifically how each statement misled Plaintiffs.  *See Bodie*, 236 F. App'x at 524.

Moreover, evidence in the record demonstrates that Defendants provided warnings and safety instructions with the relaxer kit that caution consumers of the potential for the very injuries of which Plaintiffs complain.  Specifically, packaging materials filed by Defendants indicate that the relaxer kit box includes a warning stating, "IMPORTANT – READ & FOLLOW THE SAFETY WARNINGS."  On the right side of the box are the safety warnings, as follows:

> **IMPORTANT – READ BEFORE PURCHASING**
> -This product may not be suitable for all hair types; a strand test must be performed prior to application.
> **-Not suitable for use on children.**
> **-Do not use on bleached hair, highlighted hair, hair treated with henna or metallic salts, or hair processed with a thio/perm product such as thioglycolate, thiolactate, cysteine, systeamine, sulfite.  Hair loss or breakage could occur.**

-Do not use on hair that is fragile, breaking, splitting or otherwise damaged, for example, due to frequent coloring or other chemical processes.

-If you have permanent or demi-permanent haircolor, wait at least 2 weeks before relaxing.

-Do not use if you have a sensitive, irritated or damaged scalp.

-It is recommended that you use Amla Scalp Protective Pre-treatment during application as indicated on the enclosed instructions.

**SAFETY WARNINGS**

-Read and follow the enclosed instruction sheet completely before using.  Failure to follow instructions or warnings or other misuse of the product can cause serious injury to eyes or skin and can damage hair or result in permanent hair loss.

**-Keep out of reach of children.**

**-Contains alkali.**

**-Wear gloves provided in the kit throughout the relaxing process.**

**-Avoid contact with eyes.  Can cause blindness.  In case of contact with eyes, rinse immediately and thoroughly with water and consult a doctor.**

-Keep relaxer off scalp and other skin areas.

-In case of contact with skin, rinse immediately.

Docs. 229-1 through 229-3 (emphasis in original).

Inside the relaxer-kit box, the instruction sheet contains a lengthy list of "SAFETY WARNINGS," as follows:

**When you should NOT relax your hair:**

-Not suitable for children.

-If you have a sensitive, irritated or damaged scalp.

**-If hair has been bleached or highlighted, processed with a thio (perm) product such as thioglycolate, thiolactate, cysteine, cysteamine, sufite, or treated with henna or metallic salts.  Hair loss or breakage could occur.**

-If hair is fragile, breaking, splitting, or otherwise damaged, for example, due to frequent coloring or other chemical processes.

-If you have applied permanent or demi-permanent haircolor in the 2 weeks before relaxing.

-If hot combs or other heat appliances have been used on your hair before the relaxer process.

-If your hair has been wet or shampooed in the 3 days prior to relaxing.

-If your hair has been braided or extensions have been put in during the 2 weeks before relaxing.

-If braids or extensions have just been removed.  Deep condition and wait 2 weeks before relaxing.

-If scalp has been scratched with a comb, brush or fingernails in the 3 days prior to relaxing.

-If you have used an antidandruff product in the 2 weeks prior to relaxing hair.
-If the strand test results in hair breakage or scalp irritation, do not relax the hair.

**What you should know before relaxing your hair:**

-Keep out of reach of children.
-This product may not be suitable for all hair types: a strand test must be performed prior to application.
-Read and follow directions and warnings completely.  Failure to follow directions and warnings, or other misuse of the product, can cause serious injury to eyes or skin and can damage hair or result in permanent hair loss.
-Keep relaxer off scalp and other skin areas.  Contact with scalp or other skin areas can cause serious skin irritations or burns.
-In case of contact with skin, rinse immediately.
-If irritation occurs during relaxing, immediately rinse thoroughly and use the Neutralizing Shampoo provided in the kit.  If irritation persists, consult a doctor.
**-Avoid contact with eyes.  Can cause blindness.**
**-In case of contact with eyes, rinse immediately and thoroughly with water and consult a doctor.**
-If ingested contact a Poison Control Center immediately.  Do not induce vomiting and consult a doctor immediately.
-Wear gloves provided in the kit when using and rinsing this product.
-Contains Alkali.
-Do not apply on eyelashes or eyebrows.  This product may cause severe eye irritation and permanent damage (blindness).  Do not apply to facial or body hair.  Irritation may occur.
-Do not use in combination with any products other than those provided or recommended in this kit.
-If hair has been relaxed previously, apply product to new growth only.  Application of product to previously relaxed hair can cause hair breakage.
-Wait at least 2 weeks before applying permanent hair color.
-Do not use any metallic materials for mixing or applying relaxer.
-Do not use hot combs or other heat appliances during the relaxer process.
-Do not use antidandruff products for 2 weeks after relaxing hair.

Docs. 229-4, 229-5.[10]  The instruction sheet also states, "This product may not be suitable for all hair types; a strand test must be performed prior to application."  Docs. 229-4, 229-5.  The instruction sheet lists instructions for performing a "strand test" on a small section of hair before use and recommends, if possible, to have another person apply the relaxer "[b]ecause timing and

---

[10] Doc. 229-5 reflects an updated instruction insert.  However, changes from one to the other are inconsequential for purposes of this opinion.

precision application is (sic) imperative to avoid hair loss, hair breakage, and/or scalp injury." *Id*.

The instruction sheet also lists maximum processing times—or, the maximum amount of time users should keep the relaxer cream in their hair, including application time—by hair type: fifteen (15) minutes for fine or color-treated hair, eighteen (18) minutes for medium hair, and twenty (20) minutes for coarse hair. *Id*. The instructions warn users to "not leave relaxer in contact with the hair for more than the time determined by the strand test" and "[n]ever exceed the maximum recommended processing time for your hair type." *Id*.

Plaintiffs do not refute the existence of these warnings on the product packaging, or that they warn of the very dangers Plaintiffs allege—the possibility of scalp burning, irritation, and hair loss. Likewise, Plaintiffs offer no argument for why these warnings are insufficient or state what additional information has been fraudulently omitted. Thus, Plaintiffs have not clearly stated a claim for fraudulent omission.

As to Plaintiffs' claims of fraud in regard to the benefits of the product touted on the package, the verbiage to which Plaintiffs object, already noted *infra*, is primarily found on the relaxer kit packaging. The front of the relaxer kit box contains the name of the product, "Amla Legend Rejuvenating Ritual" and, in smaller print underneath, "With Amla Oil From India." Docs. 229-1 through 229-3. Underneath the name, it is described as a "no-mix, no-lye relaxer." To the right of the product name is a photograph of a woman with straightened hair, under which the box reads, "Refills to reveal visibly fuller, silkier hair." In a top corner, above the photograph, the box reads, "IMPORTANT – READ & FOLLOW THE SAFETY WARNINGS." *Id*.

The back of the box describes Amla Legend as a "5 Step Ritual," a "no-mix cream relaxer" with "Fast relaxing processing time. Works in 13-15 minutes." *Id*. Across the top the box reads as follows:

> Optimum Salon Haircare unveils its 1st Rejuvenating Ritual for your hair, infused with a legendary Indian beauty secret: AMLA OIL.  Amla is derived from the Amla Superfruit, and is known as a powerful anti-oxidant, rich in vitamins and minerals, and renowned for its natural rejuvenating properties of intense nourishment and conditioning.  Experience the LEGENDARY POWER of AMLA OIL!"

*Id*.  The box also lists the five (5) steps for use.  Under "Scalp Protector," it states, "Protects Scalp & Skin"; under "Neutralizing Shampoo" it states, "Infuses Hydration & Conditioning"; and under "Oil Moisturizer," it states, "Anti-Dryness," "Anti-Breakage," and "Anti-Dullness."  *Id*.

First, Plaintiffs' fraud claim here again rests substantially on their contention that the product is "not a safe, effective, gentler or 'easier relaxing process'" or a "rejuvenating ritual" because it is "not free of Lye as described on the Product's packaging and other marketing materials" but rather is "composed of Lye and other ingredients that are caustic and/or allergens." Doc. 29 ¶ 46.  Again, Defendants present uncontroverted evidence that the product did not contain sodium hydroxide.

Moreover, even assuming that the representations at issue are misleading because, even without sodium hydroxide, the product does not provide the benefits touted in the packaging and marketing materials, Plaintiffs provide no evidence that they relied on any such representations when they purchased the product, or that any reliance on those representations caused them injury. *Lucky Mfg. Co. v. Activation, Inc.,* 406 So. 2d 900, 904-05 (Ala. 1981) ("[B]oth reliance and damages are essential elements to be proved in fraud actions.").

To demonstrate fraud, Plaintiffs must show that they reasonably relied on a purportedly false statement to their detriment.  Blackmon testified that she did not purchase the relaxer kit in the first instance—her daughter purchased the relaxer kits for both of them without her input.  Doc. 229-16 at 16-18.  Moreover, Blackmon testified that she did not read the relaxer carton or the instructions inside because her daughter was applying it for her.  *Id*. at 19-21.  Valrie, Blackmon's

daughter, testified that she was not influenced by any advertisements, but purchased the relaxer kit based solely on the "no-mix, no-lye" representation on the box. Doc. 229-19 at 8. Valrie stated that she did not read any other portions of the box before applying the relaxer. *Id*. at 10. Valrie testified that she "glimpsed over" the warnings and read the instructions prior to applying the relaxer. *Id*. at 24.

Carter stated that she purchased the relaxer kit online after watching a YouTube review of the product and an advertisement in Essence magazine. Doc. 229-13 at 17-18, 22. Carter stated that she opted to purchase the amla relaxer because it was a no-mix, no-lye relaxer and because it contained amla oil. *Id*. at 18-20. She testified that she did not read any other words on the box other than "no mix, no lye" before she purchased the relaxer kit. *Id*. at 21.

Thus, Plaintiffs have presented no evidence to demonstrate that Blackmon and Valrie relied on any of the advertised benefits at issue here. Taking the facts in the light most beneficial to Plaintiffs, there is evidence that Carter relied on representations about amla oil and, by extension, its benefits. However, even assuming Plaintiffs have demonstrated false claims that Carter relied on in making her purchase, Plaintiffs do not specify how these particular claims, if false, proximately caused the damages Carter alleges. Nowhere in the record do Plaintiffs state a link between the touted benefits of amla oil and injuries such as scalp irritation, burns, or hair loss. Accordingly, Plaintiffs' fraud claims fail as a matter of law.

## D.   Negligent Design/Failure to Warn (Count VII)

In their operative complaint, Plaintiffs allege that the product is defective because, contrary to the representations in marketing materials and on the packaging, it contains "Lye and other ingredients that are caustic and/or allergens" that can cause scalp burning, irritation, and hair loss. Doc. 29 ¶ 168. Plaintiffs assert that they used the product as directed and in a manner that was

intended and/or reasonably foreseeable by Defendants, and that they sustained injuries as a result. Plaintiffs assert that Defendants knew or should have known that the product was defective, and that use of the product would risk such injuries. They assert that Defendants failed to exercise ordinary and reasonable care for the safety of Plaintiffs and putative class members in designing a defective product, and in failing to warn Plaintiffs and putative class members of the characteristics, ingredients, dangers, hazards, and/or risks of injury associated with the product.

Plaintiffs assert, specifically, that Defendants negligently failed to warn purchasers that the relaxer kit contained sodium hydroxide, lithium chloride,[11] and other ingredients that are caustic and can cause injury; failed to warn purchasers of the product's potential dangers; designed a product with serious safety hazards and risks, failed to investigate safety hazards associated with the product or provide proper safety warnings; and oversold the value and benefits of the product while minimizing the true risks. In support of their claim Plaintiffs assert that Defendants received "hundreds or more" consumer complaints of injuries from the product. *Id*. ¶ 172.

At the outset, the Court notes that Plaintiffs do not specifically invoke the Alabama Extended Manufacturers Liability Doctrine ("AEMLD") in their operative complaint. Thus, they appear to bring these claims solely under a common law negligence theory. Nevertheless, the AEMLD is rooted in common law negligence, and thus, the two (2) theories are, in large part, slightly different steps in the same dance. *See Connally v. Sears, Roebuck & Co.*, 86 F. Supp. 2d 1133, 1137 (S.D. Ala. 1999) (noting that, although some Alabama and Eleventh Circuit cases have distinguished among AEMLD negligence, and wantonness claims, it is "a distinction without a difference because no matter which theory a plaintiff proceeds under, he must prove a safer

---

[11] It appears Plaintiffs may have intended to list lithium hydroxide, not lithium chloride, since lithium chloride does not appear to be an ingredient. Summary judgment is due to be granted in either case.

alternative design"); *see also Veal v. Teleflex,* 586 So. 2d 188 (Ala. 1991) (holding that liability for defective design arises from placing an unreasonably dangerous product on the market, regardless of whether the claim is brought under the AEMLD, negligence, or wantonness).

To raise a claim for negligent design under Alabama law, Plaintiffs must show "(1) a duty to a foreseeable plaintiff; (2) breach of that duty; and (3) proximate causation of injury. *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, 124 F. Supp. 2d 1228, 1233-34 (M.D. Ala. 2000) (citing *Crowne Invs., Inc. v. Bryant*, 638 So. 2d 873, 878 (Ala. 1994)). "The issue is whether the product is safe or dangerous when used as intended." *Id.* To prove negligent design, a plaintiff must demonstrate that a safer, practical alternative design was available to the manufacturer at the time the product was manufactured. *Beech v. Outboard Marine Corp.*, 584 So. 2d 447, 450 (Ala. 1991). This is true whether Plaintiffs raise a defective design claim under the AEMLD or under common law theories of negligence or wantonness. *Connally,* 86 F. Supp. 2d at 1137-38. In demonstrating a safer alternative design, plaintiffs must present evidence that their injuries would have been eliminated or in some way reduced by the use of the alternative design and the utility of the alternative design outweighed the utility of the alternative actually used, taking into consideration factors such as the intended use of the product; its styling, cost, and desirability; its safety aspects; the foreseeability of the particular accident; the likelihood and probable seriousness of injury if an accident occurred; the obviousness of the defect; and the manufacturer's ability to eliminate the defect. *Id.* at 1138.

Similarly, to raise a claim for negligent failure to warn, Plaintiffs must demonstrate each element of a negligence theory: (1) a duty, (2) that Defendants breached, (3) causing injury. *Jackson v. E&R Mfg. Co.,* Civ. Act. No. 2:06-cv-412-WHA, 2007 WL 2806831, at *9-10, 2007 U.S. Dist. LEXIS 71895 at *25 (M.D. Ala. Sept. 25, 2007) (citing *Deere & Co. v. Grose*, 586 So.

2d 196 (Ala. 1991)).  In other words, Plaintiffs must demonstrate that Defendants "failed to warn adequately of the dangers associated with use of the [product] and that [their] failure to do so proximately cause" the injuries they allege.  *Deere & Co.*, 586 So. 2d at 198.

Under the AEMLD, "a manufacturer, supplier, or seller who markets a product not reasonably safe when applied to its intended use in the usual and customary manner, is negligent as a matter of law."  *Pitts v. Dow Chem. Co.*, 859 F. Supp. 543, 550 (M.D. Ala., 1994) (internal quotations omitted) (quoting *Am. States Ins. Co. v. Lanier Bus. Prods.*, 707 F. Supp. 494, 495 (M.D. Ala. 1989)).  As the district court stated, establishing a claim under the AEMLD requires that plaintiffs demonstrate that a defendant sold a product in a defective condition unreasonably dangerous to the user, causing injury.  *Id.*  Plaintiffs must also demonstrate that (1) the seller is engaged in the business of selling such a product and (2) the product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.  *Id.*  By demonstrating those elements, a plaintiff can establish a *prima facie* case even where (1) the seller has exercised all possible care in the preparation and sale of his product, and (2) the user or consumer has not bought the product from, or entered into any contractual relation with, the seller. *Id.*

The AEMLD is a "hybrid of strict liability and traditional negligence concepts" that "retains various affirmative defenses, including contributory negligence, assumption of the risk, and, under certain circumstances, the lack of a causal relation."  *Id.*  Indeed, there is "no practical difference" between a claim based on the AEMLD and a claim based on negligence where a plaintiff's factual basis for the charge is that the defendant set a defective product into the stream of commerce.  *Id.* at 551.  The Alabama Supreme Court, in adopting the AEMLD, clarified that negligence would remain the "basis of liability in products liability litigation."  *Atkins v. Am.*

*Motors Corp.*, 335 So. 2d 134, 141 (Ala. 1976). The court "simply [held] that selling a dangerously unsafe product is negligence as a matter of law," subject to the aforementioned defenses. *Id.* "This amounts to no more than saying in traditional language that a defendant is liable if he puts on the market a product which is not reasonably safe, and the plaintiff is injured as a result of a contemplated use of that product." *Id.* at 140.

Under Alabama law, a jury ordinarily evaluates whether a product is defective, but there are instances where summary judgment is appropriate. *Connally*, 86 F. Supp. 2d at 1137. This is particularly true where an ordinary consumer understands that a product has inherent dangers. *Id.* "[W]e do not hold manufacturers liable simply because the use of their products involves some risk[.]" *Id.* (quoting *Elliott v. Brunswick Corp.* 903 F.2d 1505, 1507 (11th Cir. 1990)).

Defendants seek dismissal of these claims, arguing that Plaintiffs cannot show that the product has any defect that caused the alleged injuries. Defendants assert that Plaintiffs' sole expert performed no chemical analysis of the product and failed to compare Defendants' product to any others on the market. Additionally, the expert failed to consider whether Plaintiffs' alleged injuries were due to product misuse. Defendants assert that Plaintiffs must show that the product is unreasonably dangerous for its intended purpose beyond what would be expected by the end user, and that Plaintiffs failed to do so. Defendants assert, for example, that Plaintiffs failed to place the relative danger of the relaxer kit in context with any other hair relaxers on the market, and evidence that consumers are aware of the inherent risks of hair relaxers generally. Indeed, Defendants argue that the relaxer kit's use of lithium hydroxide rather than sodium hydroxide as the relaxer's active ingredient negates any showing of unreasonable danger.

Defendants also argue that Plaintiffs failed to show the availability of a safer, practical alternative chemical formulation that would have reduced or eliminated injuries while preserving

the product's utility, as required.  Defendants also argue that Plaintiffs cannot establish a claim for failure to warn, in part, because a manufacturer is not required to warn of known dangers, and Plaintiffs already knew the risks of hair relaxers from personal experience.  They additionally argue that, regardless, the cartons, instructions, and individual containers of relaxer contained warnings of the precise injuries alleged in the operative complaint.

Here, Plaintiffs' allegation that the relaxer kit is defective is, again, largely based on their assumption that it contains sodium hydroxide, which already has been addressed.  Plaintiffs also note in the operative complaint that the product contains "other ingredients that are caustic and/or allergens."  Doc. 29 ¶¶ 168, 172.  However, as Defendants argue, Plaintiffs fail to allege any specifics regarding any other alleged defect, apart from a general statement that certain ingredients in the relaxer kit are generally caustic and can cause injuries.  It is simply not clear from the pleadings, or the record, how the product is allegedly defective once the allegation regarding sodium hydroxide is removed.

Tackett noted in his expert report that the chemical process required to straighten hair is "damage to the hair shaft," regardless of whether it is a lye-based or no-lye relaxer, and that even a no-lye relaxer like lithium hydroxide can damage the scalp.  Doc. 229-11 at 5-6.  However, he conceded that no-lye relaxers contain an alkalizing agent such as lithium hydroxide, which are not as strong as sodium hydroxide.  *Id*.  Tackett also opined that "hair relaxers manufactured and distributed by LOREAL contain several components … that can cause serious harm when applied topically."  Doc. 229-11 at 8.  However, Tackett appears to be speaking generally of L'Oreal relaxers, not specifically about this particular product.  Moreover, it is clearly stated in the instructions that the relaxer cream is not intended to be applied topically, i.e., users are instructed not to let the relaxer cream come in contact with their skin.

In rebuttal, Defendants' expert Annette B. Santamaria, a toxicologist, noted that Tackett, in his report, did not address the "fact that the potential toxicity of an alkaline chemical is directly related to the product use patterns, concentration, pH, and the amount and duration of exposure, which are the most important toxicological drivers." *Id*. Santamaria also opined that, based on her review of the product, "there should not be any adverse effects to the scalp or hair" when the relaxer is applied according to the instructions provided in the kit. Doc. 229-7 at 5.

Similarly, Defendants' expert John A. Clark, a medical doctor and expert in surveillance and safety signaling, opined that hair relaxers generally "inherently balance[] the risk of hair damage versus the reward of obtaining straight hair," similar to hair dyes and bleaches, and this particular product "does not demonstrate any valid evidence that it is unreasonably safe." Doc. 229-9 at 15. He also noted that this type of product has a "high likelihood" of resulting in a complaint to L'Oreal if a consumer has an unsatisfactory experience, but there is 'no evidence that has been presented that the number of health related complaints made about this product is outside the industry norm, let alone significantly outside." *Id*. at 15-16.

Westman stated in his expert report that both lye (i.e., sodium hydroxide) and no-lye (i.e., lithium hydroxide) relaxers are capable of damaging hair and irritating skin if used improperly. Docs. 229-8 at 13, 230-1 at 13. Westman opined that the product is "safe and effective as formulated," reported user complaints were "minimal," and "users who did not perform a Strand Test prior to treatment, or in any way chose to disregard usage directions and warnings, misused the product, increased the likelihood of their hair being overprocessed and thereby damaged, or broken, as well as their skin being irritated." Doc. 229-8 at 17-18, 230-1 at 17-18. Westman also noted in his report that Plaintiffs conceded that they misused the relaxer kit in various ways. *Id*. at 19-20.

For example, Carter, Valrie, and Blackmon all admit in the record that they shampooed her whole head of hair with the neutralizing shampoo after performing the strand test, which is contrary to the instructions in the relaxer kit.  Doc. 229-15 at 6, Doc. 229-18 at 3, Doc. 229-19 at 3.  Carter and Valrie—who also straightened Blackmon's hair—both testified to performing the strand test on hair near the top or side of their head rather than close to the neck, as directed.  Doc. 229-13 at 24.  Valrie testified that she applied the relaxer to her scalp and her hair, which is also prohibited in the safety warnings.  Doc. 229-19 at 16.  Carter testified that some of the relaxer product got on her scalp when she was applying it.  Doc. 229-13 at 26-27.  Carter testified that her scalp burned after she applied the relaxer much worse than it had using previous relaxers and some of her hair came out.  *Id*. at 27-30, 33-35.  Nevertheless, Carter said she thought that perhaps she had misapplied the relaxer and repurchased the relaxer kit two (2) subsequent times, until the third time created a bald spot on her head.  *Id*. at 37.  Finally, Blackmon testified that the relaxer stayed in her hair for thirty (30) minutes after her daughter applied it and that it started burning badly, but she left it in for the full thirty (30) minutes, despite instructions in the relaxer kit to wash out the relaxer if it irritates the scalp.  Doc. 229-16 at 22-24.

As Defendants also note, Plaintiffs have provided no comparison to other chemical relaxers to demonstrate how this particular product is defective.  By contrast, Defendants' experts have opined regarding the relative safety of the relaxer kit formulation.  Importantly, Plaintiffs also fail to allege that any safer, practical, alternative formulation was available to the manufacturer.  Indeed, Santamaria notes that hair straighteners require an alkaline chemical such as sodium hydroxide, lithium hydroxide, or guanidine carbonate, to alter the physical structure of hair strands and allow straightening to occur.  Doc. 229-7 at 5.  Similarly, Westman states that the use of a high-pH alkali is "necessary to achieve a straightening effect.  All alkali are capable of causing

hair breakage, burning, and skin irritation if misused." Docs. 229-8 at 12, 230-1 at 12. Plaintiffs' own expert testified that lithium hydroxide, while still potentially damaging, is a gentler alternative to sodium hydroxide. Thus, Plaintiffs' claim of negligent design is due to be dismissed.

As to Plaintiffs' failure to warn claim, they again allege that Defendants negligently failed to warn consumers of the presence and dangers of sodium hydroxide—a claim that must be dismissed here for the same reasons already stated. Moreover, the Court also noted *supra* that the safety warnings on the relaxer-kit box and on the instruction sheet inside warn explicitly of the potential for precisely the injuries Plaintiffs sustained, as well as myriad other potential hazards. Defendants provided detailed instructions for use and cautioned consumers to read and follow them completely. *See* Docs. 229-1 to 228-4. The relaxer kit provides substantial warnings to consumers.

Although Tackett opines that the relaxer labels do not adequately communicate the dangers of the product, the only examples of inadequacy he provides are (1) the representation that product "does not contain lye in large bold type on the product kit is false and misleading," and (2) the instructions to the strand test are ambiguous because they do not specify what constitutes a "small amount of hair" for the test and they do not define "scalp protective." *Id*. However, as noted *supra*, Tackett's opinion that the "no-lye" label is misleading is based on the ingredients list for the shampoo and not on any independent testing or other evidence. Moreover, Plaintiffs make no specific allegation in their failure-to-warn claim about the adequacy of the strand test instructions. Consequently, Plaintiffs have provided no evidence that would demonstrate a need for additional warnings.

There is also evidence that any additional warnings would not be heeded. *See Yarbrough v. Sears, Roebuck & Co.,* 628 So. 2d 478, 482-83 (Ala. 1993) ("A negligent-failure-to-adequately-

warn case cannot be submitted to a jury unless there is some evidence that the allegedly inadequate warning would have been read and heeded and would have kept the accident from occurring."). Blackmon testified that she did not read the warnings or instructions in the first instance, and Valrie testified that she "glimpsed" the warnings and read the instructions. Although Plaintiff Carter testified that she read all the instructions prior to use, she also testified to misusing the product in multiple respects. Nevertheless, Plaintiffs have not provided evidence to support their argument that Defendants failed to warn Plaintiffs of the potential for the injuries they sustained, while Defendants have provided substantial evidence that consumers were warned of the product's risks and the potential for the precise injuries alleged. Thus, Plaintiffs cannot demonstrate at least one necessary element for negligent failure to warn. Accordingly, Plaintiffs negligent design and failure to warn claims are due to be dismissed.

### V.    MOTIONS FOR CLASS CERTIFICATION/APPOINTMENT OF CLASS COUNSEL

As an initial matter, Plaintiffs' motion for class certification appears moot: the remaining claims are due to be dismissed on the merits, leaving no claims for a putative class to pursue. Indeed, Alabama district courts have denied motions for class certification on that basis. *See, e.g., Thornton v. Mercantile Stores Co*., 13 F. Supp. 2d 1282, 1289 (M.D. Ala. 1998) (noting that "the vast majority of courts have held that dispositive motions may be considered prior to ruling on a motion for class certification"); *Mitchell v. Indus. Credit Corp*., 898 F. Supp. 1518, 1537 (N.D. Ala. 1995) ("[U]nder proper circumstances, as exist in this case, where early resolution of motions for summary judgment would save the court and parties from needless and costly litigation and where the parties would not suffer significant prejudice it would seem permissible and not an abuse of discretion for the court to rule on the motions for summary judgment without deciding the class certification issue."). However, the case law is not altogether uniform on this point. *See, e.g.,*

*Eisen v Carlisle and Jacquelin*, 417 U.S. 156, 178, 94 S. Ct. 2140, 2153, 40 L. Ed. 2d 732 (1974) (internal quotations and citation omitted) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."); *Adair v. Johnston*, 221 F.R.D. 573, 576 (M.D. Ala. 2004) ("Generally speaking, courts should address motions for class certification before ruling on dispositive motions.").   The Eleventh Circuit has stated that a "plaintiff's capacity to act as representative of a class is not necessarily terminated when he loses his case on the merits."   *Gonzalez-Sanchez v Int'l Paper Co*., 346 F. 3d 1017, 1023 (11th Cir. 2003) (remanding for a determination of whether a case or controversy remains after a grant of summary judgment and, if so, a determination of whether class certification is appropriate).   In light of the case law, the Court will address the motion for class certification on its merits.

Fed. R. Civ. P. 23 governing class actions requires the following:

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).   These requirements are known as numerosity, commonality, typicality, and adequacy, and they ensure that class claims are "effectively limit[ed] … to those fairly encompassed by the named plaintiff's claims."   *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349, 131 S. Ct. 2541, 2550 , 180 L. Ed. 2d 374 (2011).   Rule 23 also requires, in relevant part, a showing that "questions of law or fact common to class members predominate over any questions affecting only individual members."   FED. R. CIV. P. 23(b)(3).

In regard to commonality, a common contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350, 131 S. Ct. at 2551. In other words, "What matters to class certification … is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (internal quotations, citation, and emphasis omitted).

Here, Plaintiffs state that their claims arise from a common course of conduct and common set of circumstances—namely, that class members "were all exposed to the same uniform misleading, deceptive misrepresentations." Doc. 212 at 42. Thus, Plaintiffs assert that common questions to be resolved in this case are:

1. Whether Defendants[] negligently failed to comply with the requirements of the FDCA and introduce a misbranded product into interstate commerce;
2. Whether Defendants[] negligently failed to comply with the requirements of the FPLA and introduced a misbranded product into interstate commerce;
3. Whether the Representative Plaintiffs and Class Members have suffered an ascertainable loss of monies or property or other value and are entitled to compensatory damages as a result of Defendants' misbranded Product, including a purchase price refund;
4. Whether the Representative Plaintiffs and putative Class Members are entitled to punitive damages in light of Defendants' introduction of the misbranded Product into interstate commerce with reckless disregard for and deliberate indifference to the Representative Plaintiffs and Class members, the FDCA and the FPLA; and
5. Whether the Representative Plaintiffs and putative Class Members are entitled to equitable, declaratory or injunctive relief and, if so, the full nature of such relief.

*Id.* at 42-43.

In their opposition to class certification, Defendants argue that Plaintiffs are attempting to raise new claims under the FDCA and FPLA that were unpled in the operative complaint, and thus, the motion should be denied outright. In response, Plaintiffs assert that they are not attempting to

raise enforcement actions under the FDCA or FPLA, but rather, to allege negligence.  Plaintiffs assert that Defendants had a duty to comply with the federal statutes, which provide consumers a right to truthful information.  They contend that Defendants failed to provide truthful information by misbranding their product and, consequently, Plaintiffs were injured when they purchased the product.

As an initial matter, Plaintiffs do not attempt to argue that they wish to certify a class claim for fraud.  Thus, that class claim has been abandoned.  Although Plaintiffs assert that they seek to certify their claim for "negligence," the claim they allege in the motion for class certification is "Defendants' Negligent Misbranding of the Product," a claim Plaintiffs further whittle down to "Defendants' Misbranding of the Product in Violation of the FDCA" and "Defendants' Misbranding of the Product in Violation of the FPLA."  Doc. 212 at 31-36.  Plaintiffs' entire Rule 23 analysis is predicated on those allegations, but they are not the claim pleaded in the operative complaint.

The remaining claim raised in Plaintiffs' operative complaint is negligent design and failure to warn.  Although this claim is rooted in common-law negligence, it is not "negligent misbranding" under the FDCA or FPLA.  Regardless of whether Plaintiffs characterize their allegations as a claim brought directly under the federal statutes or as a "negligent misbranding" claim premised on Defendants' alleged violations of the federal statutes, Plaintiffs attempt to raise a new claim for relief at this late stage in the proceedings.[12]  *See Gilmour v. Gates, McDonald and*

---

[12] The Court notes that Defendants raised essentially this same argument in their motion for summary judgment.  However, the argument in that case was premised primarily on representations Plaintiffs made in their response to a prior summary judgment motion, which was superseded by the pending one, and on Plaintiffs' motion for class certification, which was not directly relevant.  Moreover, Plaintiffs made at least a nominal attempt in their response to Defendants' motion for summary judgment to defend the claims in the operative complaint.

*Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).  A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").  At best, Plaintiffs are mischaracterizing their original failure-to-warn claim to the point that it is beyond recognition.  Even assuming Plaintiffs invoke these federal statutes in order to demonstrate that Defendants breached a duty to warn Plaintiffs of the relaxer kit's dangers, violation of the federal statutes is not the standard for demonstrating failure to warn under common law negligence, and thus, such violations are not dispositive.

The Alabama Supreme Court has stated that "the duty to warn end users of the dangers of products arises, in a pure negligence context, from § 388, *Restatement (Second) of Torts*," and states:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition*,* and
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

*Ex parte Chevron Chem. Co.,* 720 So. 2d 922, 924-25 (Ala. 1998) (emphasis omitted).  Thus, the question of whether Defendants violated the FDCA or FPLA will not answer even the question of whether Defendants breached their duty for purposes of a negligent-failure-to-warn claim. Consequently, the common questions stated by Plaintiffs do not properly address the product-liability claim raised in the operative complaint.  Plaintiffs may not reframe their claim for purposes of class certification.  Plaintiffs' motion is due to be denied.

The Court notes that, even if Plaintiffs could meet the commonality requirement, their motion would fail on the basis of predominance under Rule 23(b)(3) because Plaintiffs have failed to sufficiently address the differences in state product-liability law that impede certification.  "To assess the impact of a common question on the class members' claims, a district court obviously must examine not only the defendant's course of conduct towards the class members, but also the class members' legal rights and duties."  *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Svs., Inc.*, 601 F. 3d 1159, 1170 (11th Cir. 2010).  "At the class certification stage, '[t]he party seeking certification … must … provide an extensive analysis of state law variations to reveal whether those pose insuperable obstacles.'"  *Jones v. Depuy Synthes Prods., Inc*., 330 F.R.D. 298, 314 (N.D. Ala. 2018) (internal quotations and citation omitted).  "In a multi-state class action, variations in state law may swamp any common issues and defeat predominance."  *Id*. (internal quotations and citation omitted).  "Although there is no categorical bar to class treatment where the law of multiple states will apply, courts have expressed some skepticism of such treatment, particularly in substantive areas where the content of state law tends to differ."  *Sacred Heart Health Sys., Inc.,* 601 F.3d at 1180.

Here, Plaintiffs seek to certify a nationwide class that includes every state but New York. Plaintiffs submit with their motion an exhibit outlining each state's requirement for "negligence" and assert in their motion that the requirements for negligence are generally similar—i.e., a breach of a duty, proximately causing injury.  Doc. 212 at 47-49, Doc. 212-25.  Plaintiffs also address state differences in relation to contributory or comparative negligence, but argue that those differences are not a bar because there can be no showing of negligence on the part of plaintiffs where they are claiming only economic injury for purchasing a misbranded product.  Plaintiffs assert that any other differences, such as statute of limitations variations, may be accommodated

at trial by grouping plaintiffs according to state law differences and providing jury instructions. However, "[t]he necessity of a large number of subclasses may indicate that common questions do not predominate." *Sacred Heart Health Sys., Inc.,* 601 F. 3d at 1176.

However, the claim brought in the operative complaint is negligent design and failure to warn. Although Alabama recognizes such a claim both as a common law claim and a statutory claim brought under the AEMLD, other states take different approaches. Plaintiffs have not addressed these differences or how they could be accommodated. Thus, Plaintiff's motion for class certification is due to be denied.

## VI.    CONCLUSION

Based on the foregoing, the Court **ORDERS** the following:

(1) Plaintiffs' motion to strike (Doc. 234) is **GRANTED IN PART** and **DENIED IN PART**. It is granted as to the manufacturing records, which are hereby **STRICKEN**. It is denied as to Barbara Mitchell's declaration.

(2) Defendants' amended motion for summary judgment (Doc. 228) is **GRANTED**.

(3) Plaintiffs' motion for class certification (Doc. 212) is **DENIED**.

(4) Plaintiffs' motion for appointment of class counsel (Doc. 214) is **DENIED as moot**.

A separate judgment will issue pursuant to Fed. R. Civ. P. 58.

**DONE and ORDERED** this 21st day of April 2020.

/s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE